*1842.*

*WETMORE*
*v.*
*SCOVELL AND*
*OTHERS.*

---

WETMORE *v.* SCOVELL and others.

---

Chancery assumes jurisdiction to restrain the publication of private letters on no other principle and upon no broader ground than that of copy-right or literary production or of a property in the paper on which they are written. It will not exercise the power to prevent the publication of private letters of business on the ground of copy-right or of literary property when they possess no attribute of literary composition. Nor because they were written in confidence and the publication might wound the writer's feelings.

---

THE bill was filed for a perpetual injunction against the defendants' printing, publishing, circulating or in any manner, either by writing or by any other manner, making public or disposing of certain letters written by the complainant.

It appeared by the bill that the complainant held a responsible situation as an officer of the customs in New York, under the United States; and that, previous to the occurrence of the matters embraced by the bill, he had been on terms of personal intimacy and confidence with one Charles F. Mitchell; and also that, in consequence thereof, the complainant, at various times, was in the habit of addressing to and receiving from the said Mitchell—who was during a certain period a member of the House of Representatives of the United States, —letters and correspondence exclusively relating to matters of private concern between the complainant and the said Charles F. Mitchell, and that all such letters were well understood to have passed in the confidence of friendship, and

*March 9,*
*1842.*

*Jurisdic-*
*tion.*
*Private let-*
*ters.*
*Injunction.*

were well understood by both to have been private and confidential and were, in no event or contingency, to be made public in any form whatever.   Also that, during the priod referred to, the complainant wrote a number of letters to the defendants James N. Reynolds and Marshall O. Roberts, who were also, at various times, sojourning at Washington—which letters were sealed and, with the consent of the said Charles F. Mitchell, enclosed under cover to him, to be by him delivered to the said James N. Reynolds and Marshall O. Roberts, and which the said Mitchell promised and agreed to do.  Also, that the complainant had occasion, in several instances, to visit Washington and, with the consent of Mitchell, he instructed several persons residing in New York, in case they should have occasion to correspond by letter with him, to enclose such letters sealed and directed to him under cover to the said Mitchell, who promised and agreed to deliver such letters to the complainant ; and that various persons did write, &c. and their letters were private, confidential and sealed, and in no event to be opened by any third person.   That the complainant had never consented or agreed that any of the aforesaid letters should, in any manner whatsoever, be made public, nor had any person to whom he had addressed any letter agreed to such publicity.   The complainant also showed by his bill that about the end of March, one thousand eight hundred and forty-one, the said Charles F. Mitchell absconded ; and was afterwards arrested and brought to New-York and imprisoned on several charges of forgery.   That, as he the complainant was informed and believed, the papers and letters which had been in the custody of the said Charles F. Mitchell before his arrest, embracing all or some of the letters so written to him by the complainant, and also many of the letters written by the latter to the said James N. Reynolds and Marshall O. Roberts, and by other persons to the complainant, were delivered over by the police magistrate, in whose custody they had been, to the said Charles F. Mitchell.   That some short time after the trial and conviction of the said Charles F. Mitchell, as the complainant was informed and believed, it being generally known or understood that the said Mitchell was in possession of various letters which he had received while a member of the House of Representatives, and among others, of the let-

ters before referred to, various persons to the complainant unknown, and among others Joseph A. Scovell, Charles A. Secor, Alexander J. Bergen and Charles Watrous, defendants, became desirous to possess themselves of the said letters for the wicked and sinister purpose of publishing the same contrary to the purposes for which they were written, and in violation of the rights of the complainant and of the laws of this state—the said Scovell, Secor, Bergen and Watrous well knowing that the same were private and confidential and not designed to be made public. Also that the said Scovell, by collusion with the other defendants, and wickedly, corruptly and illegally designing to possess himself of the said letters, shortly after the trial and conviction of the said Mitchell, attempted to induce the latter, by promises of aid in effecting his liberation and otherwise, to deliver the said letters to him the said Scovell; and that, during the month of January, one thousand eight hundred and forty-two, an order having been made by the Court of Sessions to admit the said Mitchell to bail, the said Scovell took advantage of Mitchell's anxiety for his liberation, and practising upon his hopes and fears, as the said complainant had good reason to believe and did believe, promised and agreed, if he would deliver to him the said letters, that he, the said Scovell, would procure him bail; and that, having, by these means, induced the said Mitchell to assent to the delivery of the said letters, he procured bail, and the said Mitchell, as the price of his liberty, delivered to the said Scovell the said letters. Also, as the complainant was informed and believed, the said Scovell and the other defendants or some of them, had the custody and possession of the said letters or some of them, and had exhibited them to persons for sinister, illegal and improper purposes, and had expressed an intention to publish the same or some portion thereof, and designed so to do in newspapers called the *New Era* and *Aurora*, and had made arrangements with Levi D. Slamm and Jared W. Bell, the editors and publishers of the said *New Era*, and with Thomas L. Nichols, Anson Herick and John Ropes, the editors and publishers of the *Aurora*, (all defendants) for the publication of the letters ; and the complainant believed that they would be immediately published unless the parties were restrained by injunction. *Prayer*, for a per-

petual injunction against the printing, publishing, circulating or in any manner, either by writing or by any other manner, making public all or any of the said letters; also to restrain the defendants from dispossessing themselves or any of them, in any way or manner, or parting with the letters or any part thereof, and from taking, keeping, or retaining copies, and from exhibiting the same ; and for further relief.

The defendant, Levi D. Slamm, in his answer, after admitting some of the allegations which went to the mere matters of fact in the bill, denied that the letters related exclusively to matters of private concern ; he admitted that they were written in friendship; but he was entirely ignorant of any understanding between the complainant and the said Charles F. Mitchell that such letters were to be private and confidential or in no event to be made public. He charged that the letters did not relate exclusively to matters of private concern, but, on the contrary, that they related principally to matters of personal concern and deeply involving the public interest; and that the said letters, among other things, showed that the complainant obtained his office of ———— (which office the defendant submitted was one of high trust and great responsibility, and should be filled by a person of pure and irreproachable character,) by base, unworthy and dishonorable means ; that the said plaintiff applied for and obtained the said office with a fixed and determined calculation and intention to apply a part of the public moneys which would thereby pass through his hands to objects and purposes not contemplated by law, and to amass large sums over and above the compensation attached to the said office by frauds on the government in the discharge of the duties of the office ; and that the complainant had been concerned and implicated in gross and criminal transactions developing a laxity of morals, depravity of purpose and an insensibility to honest or honorable feelings which proved him to be an unfit and improper person to hold the said office, and would be sufficient, as the defendant believed, upon being laid before the proper authority, to ensure his removal. That the defendant was ignorant as to whether the letters written by the complainant to Reynolds and to Roberts or those written and directed to the complainant as stated in the bill were all of them private and confidential or whether

1842.

WETMORE
v.
SCOVELL.

they were sealed, or whether they were designed for the inspection solely of those to whom they were severally addressed or whether they were in no event or contingency to be opened by any other person, or whether they were or not to be made public in any form whatsoever. That the defendant had heard and did believe, and therefore charged, that the said Charles F. Mitchell was willing and had consented that the aforesaid letters, if the same could be procured, might be made public for the purpose of promoting the ends of justice and procuring the removal of the complainant from his aforesaid office of Navy Agent. The defendant admitted that the said Scovell, Secor, Bergen and Watrous, or some or one of them, had expressed themselves to the effect that, if it was in their power so to do, they would publish some of the letters in the newspapers denominated *The New Era* and *Aurora*. The defendant denied that Scovell made any arrangement with the defendant to publish the letters; admitted that he himself was the editor of the "New Era"; but charged and insisted that if he published in the said newspaper any matter false, malignant or libellous, the party aggrieved thereby had his proper and appropriate remedy at law; and claimed that the right so to object might be of like effect as if he had demurred; also, that it was not in the power of the court to restrain the defendant from publishing the said letters or any of them, if they should come into his possession and he should determine so to do, and that the right to publish the same, holding himself responsible to the courts of law for such act, in case it should be judged illegal, was guaranteed to the defendant by the constitution and laws of the state of New York, and that the said complainant had not, from the time his letters to Charles F. Mitchell reached the said Mitchell or came to his possession or within his control any title or property therein or any legal right or power to restrain the said Mitchell from publishing the contents thereof, if he should determine to do so. And he also insisted that the bill did not set forth any facts giving the court jurisdiction or control over the said letters or any of them for any purpose whatsoever; and that if the complainant had been aggrieved, as stated in his bill, he had a full means of redress afforded by the courts of law, to which alone he could, for such supposed injury, resort.

1842.

WETMORE
v.
SCOVELL.

A preliminary injunction had been granted; and a motion was now made to dissolve it.

Mr. *James T. Brady*, for the motion.

Mr. *D. Graham*, contra.

*April* 1, 1842.

THE VICE-CHANCELLOR :—The object of the bill in this cause is to restrain the defendants, by injunction, from printing, publishing, circulating or in any manner making public any letters written by the complainant to one Charles F. Mitchell, between the first of December eighteen hundred and forty and the twentieth of March, eighteen hundred and forty-one or any letters written during that period by the complainant to James N. Reynolds or Marshall O. Roberts or written by any person or persons whomsoever to the complainant; and from parting with the possession of any such letters or making copies thereof, as well as from exhibiting the same or any part or portion of the letters to any one.

A preliminary injunction was granted to that effect, on filing the bill, which the defendants have moved to dissolve. This motion has been made by all the defendants, except Levi D. Slamm, on the bill itself; and as to Mr. Slamm, it is founded on the bill and his answer thereto.

The statements of the bill, in substance, are these : That the complainant, being on terms of personal intimacy and confidence with Charles F. Mitchell, a member of congress at Washington, was in the habit, during the session referred to, of addressing to and receiving from Mitchell, letters forming a correspondence exclusively relating to matters of private concern between them ; and all the letters which so passed between them were in the confidence of friendship, and were well understood by both to be private and confidential, and in no event to be made public. That, during the same period, the complainant wrote a number of letters to James N. Reynolds and to M. O. Roberts, who were at times sojourning at Washington, which he sealed and, with the consent of Mitchell, enclosed under cover to Mitchell, to be by him delivered, and which he promised to deliver to Reynolds and Roberts. During the same period, also, the complainant had occasion to visit Washington several times, and with Mitchell's consent,

various persons in the city of New York, who had occasion to correspond by letter with the complainant, put their letters for him under cover to Mitchell; and all of which letters were private and confidential, and were sealed and not to be opened except by those to whom they were severally addressed, and in no event were they to be made public; also, that, since writing the letters to Mitchell, the complainant has never consented to their being published, nor has he or the other persons, by or to whom the other letters referred to were written, consented or agreed that the same should be opened or read by other persons. The bill then goes on to state that shortly after the 20th of March, 1841, Mitchell absconded and was subsequently arrested in Canada and brought to the city of New York and imprisoned on several charges of forgery, on one of which charges he was tried and convicted; and that he still had in his custody and possession the letters before mentioned. That it being generally understood that Mitchell was in possession of various letters which he had received while a member of congress, and, among others, the letters before referred to, the defendants, Scovell, Secor, Bergen and Watrous, became desirous of obtaining them "for the wicked and sinister purpose of publishing the same, contrary to the purposes for which they were written and in violation of the rights of the complainant and of the laws of this state," they well knowing, as the complainant believes and charges, that the letters were private and confidential and were never designed or intended to be made public. That, as the complainant is informed and believes, Scovell, in collusion with other persons named and for the purpose of accomplishing their illegal and wicked design, shortly after Mitchell's trial and conviction attempted to induce him, by promises of aid in effecting his liberation and by professions of friendship, to give up these letters to Scovell, and an order of the Court of Sessions having been made to admit Mitchell to bail, as well upon the conviction as upon the other charges, Scovell, taking advantage of Mitchell's anxiety for his liberation and practising upon his hopes and fears, as the complainant has reason to believe, promised that if Mitchell would deliver up the letters, he, Scovell, would procure bail for him; that bail was accordingly furnished and Mitchell liberated from prison, and, as

the price of his liberty, he delivered the letters to Scovell. That having thus obtained them, the complainant is informed and believes that Scovell and his associates are still in the possession of them, and threaten and intend to publish them in the newspapers called the *New Era* and the *Aurora*. That he has reason to believe from information, and does believe, that Scovell has made some arrangement with the editors and publishers of those respective papers (and all of whom are made defendants to the bill) that the letters should be immediately published in one or both of said papers, and which he believes they will do unless prevented by the injunction of this court. Hence the injunction was prayed for, and such other or further relief as the court should think proper to grant.

Upon the bill itself, independent of any thing contained in the answer of the defendant Slamm to the contrary, the question arises, whether enough is stated to give this court jurisdiction of the matter for the purpose of the preventive remedy by injunction?

Before proceeding more particularly with the facts, I shall examine the decisions of the English chancery, to see how far and upon what grounds that court has ever interfered to restrain the publication of private letters, for those decisions may furnish the principles which should be allowed to govern in the present case, since the court has jurisdiction similar to and co-extensive with that in England, but no further except where conferred by the statutes of the state.

The earliest case, involving the consideration of private letters, is *Pope* v. *Curl*, before Lord Hardwicke in 1741. (2 Atk. 341.)

Pope had obtained an injunction against the defendant, a bookseller, restraining him from vending a book, entitled, " Letters from Swift, Pope, and others," and a motion was made to dissolve it. Lord Hardwicke held that there was no distinction to be made, under the statute of 8th of Anne (securing to authors the copy-right of their productions,) between a book made up of letters and any learned or scientific work. That, although they were letters on familiar subjects, containing inquiries after the health of friends and the like, and, when written, were perhaps not intended to be published, yet there was a right of property in them which the court could protect ;

and upon the objection being made that, where a man writes a letter it is in the nature of a gift to the person addressed, Lord Hardwicke expressed the opinion that the receiver of such letters only acquired a special property; possibly, he said, the property of the paper might belong to him; but this did not give a license to any person whatsoever to publish it to the world, for, at most, the receiver had only a joint property with the writer—and the result was a continuation of the injunction only as to those letters which were under Mr. Pope's name in the book and which were written by him, and not as to those which were written to him.

The next is the case of "Lord Chesterfield's letters to his son," (*Thompson* v. *Stanhope*, Amb. 737,) before Earl Bathurst, chancellor, in 1774. The executors of Lord Chesterfield filed a bill against the widow of his natural son, to whom the letters had been addressed, to restrain her from printing and publishing them and to have the originals delivered up, upon the ground that they remained the property of the testator and were a part of his estate. And upon that ground the injunction was granted, the lord chancellor considering that the case before him was within the reason of several cases where injunctions had been granted to restrain the publication of manuscript works, such as Lord Clarendon's history of the reign of Charles II. which had been prepared and left by the author at his death and was afterwards about to be published by Dr. Shebbeare, without the consent of the author or the proprietor of the MS. (See Eden's Rep. 329.)

Upon the same principle an injunction was granted by the court of chancery of Ireland in 1809, in the case of *Granard* v. *Dunkin*, 1 Ball & Beatty's Rep. 207, on the application of an executrix to prevent the defendant from publishing letters, the property of the testator, assigning as the reason that the property in them had vested in the executrix, who would be entitled to any profit that might arise from the publication or sale if any publication of them were to be made.

Next comes the case of *Percival* v. *Phipps*, (2 Vesey & Beames, 19,) before Sir Thomas Plumer, vice-chancellor, in 1813, relating to letters of a private nature, which had been written by Lady Percival to one Mitford, in the confidence, as she alleged, that he would not part with them nor per-

1842.

WETMORE
*v.*
SCOVELL.

mit them to be published; but, in breach of that confidence, he had delivered them to the defendant Phipps for publication in a newspaper. The Vice-Chancellor intimated, at the close of the argument, that an injunction to restrain the publication of private letters must stand upon the foundation of their being literary property; and, on a subsequent day, he went more fully into the subject and showed that to be the principle on which the court protects the author.

Speaking of the case of *Pope* v. *Curl,* as being the first in which a court of equity had interposed upon the subject of private letters, he adverted to the fact that the letters of Pope had been formed into a volume and published in Ireland, and the attempt was to republish them in England when the injunction was granted, and the Vice-Chancellor then stated Lord Hardwicke's doctrine to be that letters, though familiar, may form a literary composition in which the author retains a copy-right, and does not, by sending them to the person to whom addressed, authorize him or a third person to use or publish them for profit against the interest and intention of the author, and though, by sending the letter, he parts with all property in the paper, he does not part with the property of copy-right in the composition. And so with respect to Lord Chesterfield's letters; they were of such a character as to form a book containing a complete system of education for young men and of great use to the public, and hence considered by Lord Bathurst as within the principle of *Pope* v. *Curl.* But the Vice-Chancellor was certainly not disposed to consider all private letters as partaking of the same character and entitled to the like protection. For, in the case before him of Lady Percival's letters, he remarks that though the bill was to prevent the publication of private letters, it did not state the nature, subject or occasion of them or that they were intended to be sold as a literary work for profit or were of any value to her. Upon such a case he said it was not necessary to determine the general question as to how far the court would interpose to protect the author; that such interposition did not, in that instance, necessarily follow from the cases cited; that though the form of familiar letters might not prevent their approaching the character of a literary work,

1842.

WETMORE
v.
SCOVELL.

every private letter upon any subject to any person is not to be clothed with that character and to be protected upon the principle of copy-right. He also observed that the ordinary use of correspondence by letters is to carry on the intercourse of life between persons at a distance from each other, in the prosecution of commercial or other business, and it would be very extraordinary to describe such a correspondence as a literary work in which the writers have a copy-right. So, with a correspondence between friends.or relations upon their private concerns. How far such letters, falling into the hands of third persons, could be made public in a way very injurious to the feelings of individuals, it was unnecessary then to determine, but he did not mean to say that that would afford a ground for a court of equity to interpose for the prevention of a breach of this sort of confidence, independent of contract and property. Upon the answer of the defendant, however, in the case before him, the Vice-Chancellor considered Lady Percival had failed to establish either ground for the injunction, copy-right or breach of confidence; and the injunction was accordingly dissolved.

The next case on the subject of restraining the publication of private letters, and one more elaborately discussed than any of the preceding, is that of *Gee* v. *Prichard*, before Lord Eldon in 1818. 2 Swanston, 428. There, a correspondence had been kept up many years between the parties. The letters related to various family matters and other subjects, some of them of a private and confidential nature. The original letters had been returned to the plaintiff and were in her possession, but the defendant had, without her knowledge and consent, taken a copy of them; and, from such copy, he threatened to publish the letters in a book, containing his own memoirs. The bill charged that, by returning the letters, the defendant had parted with all interest in them, if he ever had any, and that the publication would be a breach of private confidence or a violation of the right and interest of the plaintiff therein and was intended to wound her feelings and could have no other effect.

Lord Eldon had, in the first instance, granted an injunction, which the defendant moved to dissolve.

On opening the argument, counsel stated that an attempt

would be made to sustain the injunction on the ground that a publication would be painful to the feelings of the plaintiff. To which Lord Eldon replied, he would relieve them from that argument, and stated the question to be, whether the facts of the bill were such as the court could take notice of as a case of civil property, which it was bound to protect? The injunction, he observed, could not be maintained on the principle " that if a letter has been written in the way of friendship, either the continuance or the discontinuance of that friendship affords a reason for the interference of the court." (p. 440.)

In another place he observes, with reference to the charges of wounded feeling, of a breach of trust, a violation of a pledge, that that is not the ground on which he would proceed, but mainly, if not entirely, on the question whether the plaintiff had or had not property in the letters? The argument of one of the counsel, he said, had confirmed doubts which had often passed in his own mind relative to the jurisdiction of the court over the publication of letters, but the decisions of his predecessors in similar cases, after so long an acquiescence in them, he was bound to regard as the law of the court, and he would not undertake to unsettle it upon any doubts he might entertain, unless the questions should be brought before the House of Lords. He then expressed an opinion that the plaintiff, Mrs. Gee, had a sufficient property in the original letters to authorize an injunction to the same extent that the court would grant in the case of books, that is by stopping the publication, but not the reading and repeating of passages to others, because, he says, a person may assemble others around him and read and recite to them what he pleases. He considered that Lord Hardwicke, in *Pope* v. *Curl,* went out of his way to state what he thought the doctrine on the subject of letters, but, through the case of *Thompson* v. *Stanhope,* that doctrine had been handed down as the law of the court, and even following the principle of Lord Hardwicke, he would not undertake to say that the court was to interfere because the letters were written in confidence or because the publication of them would wound the feelings of the plaintiff; but if mischievous effects of that kind could be apprehended in cases in which the court had been accustomed, on the ground of

property, to forbid publication, it would not become him to abandon the jurisdiction which his predecessors had exercised and refuse to forbid it. He then notices a fact which distinguished the case before him from *Percival* v. *Phipps*, that the defendant Prichard, having so much property in the letters as belonged to the receiver and of interest in them as possessor, had thought proper to return them to Mrs. Gee, who had in them a joint property, according to Lord Hardwicke, keeping copies of them, without apprising her. The case, therefore, in that particular presented the converse of *Percival* v. *Phipps* : and he concluded that, if the defendant Prichard previously had the right of publication, he had renounced that right by returning the letters. And on the ground of property and possession. in the plaintiff and of renunciation by the defendant, the injunction was continued.

From a close examination of these cases, I think it is quite apparent that the court of chancery has assumed jurisdiction to restrain the publication of private letters on no other principle and upon no broader ground than that of a copy-right in literary productions or of property in the paper on which they are written, similar to property in stereotype or engraved plates.

The letters of Pope and Swift were of the first description, these being the productions of men of established literary reputation and who were known to write for the public ; and their letters, though on familiar subjects, might well be regarded as literary productions intended some day or other for the press, and in which the writers retained the copy-right, a species of property in which they were entitled to be protected. So it was with the letters of Lord Chesterfield ; for though they were written for the private use of his son while abroad and not then intended for the public, yet they formed a complete treatise on the education of young men, instructing them how to form for themselves the character and manners of gentlemen, and, as such, those letters were entitled to be regarded as a literary work of public utility, calculated for the press, in which a right of literary property existed belonging to the author or his personal representative.

In the case before the Lord Chancellor of Ireland, he interfered at the instance of the executor, not so much on the

1842.

WETMORE
v.
SCOVELL.

ground of literary property as on the ground of chattel pro-
perty in the manuscripts or papers.

It was on the like ground of an exclusive chattel property
in the letters of Mrs. Gee to Prichard, which she had acquired
by his surrender and return of them to her, that Lord Eldon
protected her against the threatened publication. And those
of Lady Percival stood upon a similar footing, and on no other
principle could she have been protected had the Vice-Chan-
cellor not considered she had waived her right and by her
own conduct rendered it necessary for the defendant's justifi-
cation that he should be allowed to publish them.

The distinction between letters having all the characteris-
tics of literary compositions, such as have been described,
though kept private, and private letters on affairs of business
or domestic concerns or written as mere acts of friendship,
is very obvious. The latter, according to Sir Thomas Plumer,
cannot reasonably be clothed with the attributes of property
in the compositions, which belong to the former description of
writings and are, therefore, not entitled to the same protection.
I find no instance, and I believe none can be found, where the
court of chancery has exercised the power of preventing a
publication of private letters of business on the ground of
copy-right or literary property, when they possess none of
the attributes of literary compositions—such an attribute is
not a mere fiction which the court will lay hold of to obtain
jurisdiction. It is a property which a man has in the produc-
tions of his own genius as real and substantial as though it
were the work of his own hands, and, in many cases, is of
great value to the possessor. And it is not upon the mere
supposition or presumption of such a right that the court will
act. The right must be shown to exist in reality or the court
will not undertake its protection. The same remark may be
made with respect to the right of property in manuscripts—it
must appear to be an ownership in the papers like the owner-
ship of any other chattel; but being a peculiar kind of pro-
perty of singular value, susceptible of being easily destroyed or
rendered valueless to the owner and the damage, perhaps,
hardly to be fully appreciated by a court of law, chancery
steps in and affords the necessary protection by injunction
against the invasion of property, as auxiliary to a remedy at

law.  See *Lawrence* v. *Smith,* Jacob's Rep. 471.  But, independent of property and disconnected therefrom, there is no ground or principle on which the jurisdiction to restrain the publication of private letters can properly rest.

Mr. Justice Story has, indeed, expressed himself strongly and eloquently in favor of such a jurisdiction upon the ground of violated confidence and wounded feelings ; and he deplores the evils that may result from an unrestrained publication of private letters not falling within the line of literary composition, considering it would be a sad reproach to English and American jurisprudence if courts of equity could not interfere in such cases.  And fortunately, he says, for public as well as private peace and morals, the learned doubts on this subject have been overruled ; and it is now held that there is no distinction between private letters considered as literary compositions and private letters relating to matters of business merely, not possessing that character in respect to the authority of this court to restrain their publication (2 Story's Com. on Equity, 220, 222,) and he refers to Lord Eldon in *Gee* v. *Prichard,* as having settled that principle.  It is true that this court makes no distinction as to the exercise of its power and jurisdiction in regard to copy right in one species of letters and the right of property in the paper and writing of the other description of letters, for both are rights of property which the court will undertake to protect ; but if the learned commentator means to say that Lord Eldon has decided that there is no distinction in respect to the jurisdiction and power of this court to restrain a publication, whether there be copy-right in literary productions or no such right or no other right of property in private letters, and in the latter case the publication will as promptly be forbidden as in the former, merely and solely because it may disturb the peace of families and outrage the feelings of the authors of such letters, then I cannot but think he has formed an erroneous estimate of what fell from Lord Eldon on that occasion, for Lord Eldon had previously declared, in the same case, that he was not to interfere, because the letters of Mrs. Gee had been written in confidence and because the publication of them might wound her feelings. And in the recent case of *Brandreth* v. *Lane* (8 Paige, 24) Chancellor Walworth takes occasion, very properly, to remark

that the utmost extent to which the court of chancery has ever gone in restraining any publication, by injunction, has been upon the principle of protecting the rights of property and upon that principle alone Lord Eldon, he says, placed the decision in *Gee* v. *Prichard*, though Chancellor Walworth seems to think that, in so doing, Lord Eldon had assumed too much, since the object of the bill in that case was not to prevent the publication of the plaintiff's letters on account of any supposed interest she had in them as literary property, but to restrain the publication of a private correspondence as a matter of feeling only. The matter of literary property or copy right was not indeed involved in the case of *Gee* v. *Prichard*, but the right or title to the letters as one species of property and that too accompanied by a possession was involved and that was sufficient to give jurisdiction. It is said in a work of good authority that there is, perhaps, but one instance in the books of any judge having maintained the existence of a power in the court of chancery of restraining publications on any other ground than that of property and copy right (alluding to Lord Macclesfield as that judge) and that was done in language so strange and unconstitutional as to carry with it its own refutation: Eden on Injunctions, 228. And Lord Eldon, in the subsequent case of *Lawrence* v. *Smith*, supra, places the jurisdiction upon the same ground, viz: that of property; observing, " that if the one party has that right, the other party must not invade it; if he has not that right, the court cannot give to him the consequences that belong to it."

This, then, being the principle on which the court assumes jurisdiction to restrain publications, where there is no obstacle in the way to prevent its exercise, it becomes necessary to turn to the complainant's bill, in order to see whether his case comes within it.

The bill does not proceed on the ground, (for it is not so alleged or pretended,) that the letters in question have the character of literary compositions in which a right of literary property or copy right exists or that any such right will be invaded by the threatened publication; nor does the bill claim for this complainant any right of property in the material of which these letters or any of them are composed. But the sole *gravamen* of the bill is that the letters, having relation

1842.

WETMORE
v.
SCOVELL.

exclusively to matters of private concern, written in the confidence of friendship and being of a private and confidential nature, not intended for the public eye, the person to whom some of them were written and to whom others were entrusted for delivery has abused the confidence and betrayed the trust reposed in him; and to subserve his own purposes in obtaining liberation from imprisonment he has delivered the letters to the conductors of a public press who, for sinister purposes and contrary to law as alleged in the bill, are about to publish them to the world. The grievance, then, consists in the treachery or perfidy of Mitchell, whichever it may be called; and in the wicked and sinister designs of the defendants or some of them in possessing themselves of the letters for the purpose of publication; but, without alleging that Mitchell's misconduct, his breach of faith and disregard of honor and moral obligation has been or will be at all injurious to the complainant or that the publication of the letters will affect his character or standing or lessen him in public estimation or subject him to any loss of credit or property in his commercial or other pursuits or that it will endanger his title to the office of Navy Agent which, it appears from the bill, he holds. Nor does the bill allege that the contents of the letters are such as it would be unbecoming, indecent or improper to lay before the public, except so far as it may be indecorous to publish matters relating merely to the private concerns of individuals. In what respects the design of the defendants in relation to the publication are wicked, corrupt and illegal, as alleged in the bill, does not distinctly appear. It is a broad and general charge, without specification, and can, as I suppose, only have reference to the fact that, inasmuch as the object is to disclose the private and confidential communications which have passed between friends, it carries with it the evidence of a wicked, depraved and sinister purpose and its own dishonor; for I know of no other law than that which may be found in a just sense of propriety and honor to forbid the publication of private letters or papers, not having the character of property about them. If this be the correct view of the grievance as presented by this bill, it seems to me to amount to nothing more than this, that there has been a gross breach of honor and trust on the part of Mitchell, which is wounding to

the feelings of the complainant, inasmuch as it must be morti-
fying in the extreme to be thus deceived and betrayed by one
in whom he had confided as a friend, but not otherwise inju-
rious or producing any loss or damage.

And supposing the publication, under such circumstances,
to amount to an unwarrantable and wrongful act, it is a wrong
which works not such an injury as the laws of the state can
notice or the courts of justice can undertake to remedy or pre-
vent. After all that can be done by the judicial tribunals of
the country, much must be left to the dictates of conscience,
to the usages of society and to the corrective influence of
public sentiment and opinion. To that tribunal many things
relating to individual conduct as well as to public measures
must be referred, and whether the defendants in this case can
justify themselves to the public in laying before that public
the letters in question, if they shall think proper to do so, is
not for me to say; but of one thing I am quite confident as a
judge appointed to administer the preventive and remedial jus-
tice which legitimately belongs to this court to be administered:
that the grievance, as presented by this bill of complaint, is
not such as the court can judicially take cognizance of as a
ground of jurisdiction on which to interpose and prevent the
publication of the letters.

Having come to this conclusion, it is unnecessary to say
any thing on the subject of an interference with the freedom
of the press in restraining publications of this sort; but, in a
case otherwise proper, I apprehend the granting of an injunc-
tion would not be such an interference as the fundamental law
of the state has in terms or by implication forbidden. That
great principle of a free government the liberty of speech and
of the press is very wisely guarded by a constitutional provi-
sion against the encroachment of either legislation or judicial
power. It is, however, nothing more than a liberty which
every citizen has, to speak, write and publish his own senti-
ments either originating with himself or such as he chooses to
make his own by adoption with the consent of the author ex-
pressly or impliedly given, being responsible for the abuse of
that right. But this liberty is not to be understood as includ-
ing the privilege of publishing the sentiments of others without
their consent, provided the authors have thought proper to put

their sentiments into such a form as to endue them with the character of property and to preserve to themselves the right of property in them. Such an extension of the liberty of the press, if not subjected to the wholesome restriction of a court of equity in a proper case, would go to destroy a valuable right of property and deprive scientific and learned men of the fruits of their labor, after the best part of a life had been spent in study and in the acquisition of scientific and useful knowledge.

I refrain, also, from any examination of this case upon the matters set up in the answer of Mr. Slamm as justificatory of his motives as an editor, in wishing to give these letters publicity and as contradicting the motives imputed to him and to the defendants generally by the bill in the cause. Such an examination is not necessary to the decision of the present motion ; for, according to my views of the case upon the bill itself, the complainant is not entitled to the injunction and it must, therefore, be dissolved.