CASE 100—PETITION EQUITY—NOVEMBER 26.

# Grigsby and wife vs. R. J. Breckinridge.

### APPEAL FROM MERCER CIRCUIT COURT.

1. An author retains a qualified property in the contents of letters written by him to others, and he alone has the right to publish them for his own benefit; and therefore, and also because they reflected his emotions and sentiments, he has a right to enjoin the publication of them by the recipient or any other person; and this embraces the author's property in his letters to the full extent.

2. The recipient of a private letter, sent without any reservation, express or implied, is invested with the general property in such letter, qualified only by the incidental right in the author to publish and prevent publication by the recipient or any other person. The general property implies the right in the recipient to keep the letter or to destroy it, or to dispose of it in any other way than by publication.

3. The unqualified delivery of a letter being adjudged a gift of all the author's right to it, except his right to publish, if existing, and to prevent its publication without his consent, the author and the recipient cannot hold a joint property in it, because that would entitle each to the possession, which, as to such a thing, would be absurd.

4. Friendly and confidential letters, received during her girlhood and first marriage, from her first husband and others, as well as those received during her widowhood and second marriage, from her second husband and others, are the separate and peculiar property of the wife, like her jewels, which she had the right, as between herself and husband, to keep and dispose of, regardless of her husband's will.

J. F. Bell and J. M. Harlan,                    For Appellants,

CITED—

1 *Metcalfe*, 402.

18 *B. Mon.*, 71; *Bennett, &c., vs. Garrett, &c.*

5 *Bouvier's Bacon's Abridgement*, 199.

2 *Story's Equity Jurisprudence*, 946 *and* 947.

4 *Kent*, 465.

Grigsby and wife vs. R. J. Breckinridge.

*Bouvier's Law Dictionary, vol.* 2, *p.* 31.

2 *Atkins,* 341; *Pope vs. Curl.*

3 *Edwd. Chy. R.,* 515; *Wetmore vs. Scovill.*

2 *Story's Reports,* 319.

*Clancy on Husband and Wife, pp.* 280–1.

HUNT & BECK,                                              For Appellee,

CITED—

2 *Atkins,* 342; *Pope vs. Curl.*

4 *Barrow; Webb vs. Rose.*

*Amber,* 737; *Thompson vs. Stanhope.*

*Swanston,* 42; *Gee vs. Pritchard.*

1 *Ball & Beatty,* 207; *Earl of Granard vs. Duncan.*

4 *Barrow; Miller vs. Taylor.*

*Brown's P. C.; Forrester vs. Waller.*

4 *Davis' (N. Y.) R.,* 100; *Woolsey vs. Judd.*

2 *Story's Rep.,* 100; *Folsom vs. March.*

*Story's Equity Jurisprudence, secs.* 942 *to* 949.

3 *Edwards' Ch. R.,* 375; *Wetmore vs. Scovill.*

2 *Barbour's Ch. R.,* 320; *Hoyt vs. McKenzie.*

2 *Edin. Rep.,* 329; *Duke of Queensberry vs. Steblian.*

2 *Merivale; Southey vs. Sherwood.*

*Ambler,* 694; *Macklin vs. Richardson.*

5 *D. & E.,* 245; *Coleman vs. Nathan.*

4 *McLean's C. C. Rep.,* 300; *Bartlett vs. Crittenden.*

*Civil Code, secs.* 118, 153, 167, 168, 672, 174, 175.

18 *B. Mon.,* 71; *Bennett, &c., vs. Garrett, &c.*

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

In its aim, its principles, and its results, this is a novel and intensely interesting litigation.

Alfred Shelby was the first, and Robert J. Breckinridge the last, husband of Virginia Hart, who died on the 8th of May, 1859, while she was Breckinridge's wife. She had carefully preserved a large number of friendly and

VOL. II—31

confidential letters, which she had received during her girlhood, widowhood, and wedded life. And, as proved by an answer to interrogatories, made testimony by the Code of Practice, she had, on her death-bed, given and delivered them to Mrs. Grigsby, an only daughter of the first marriage. And, on the 9th of September, 1859, Breckinridge, who, in the meantime, had been appointed administrator of his deceased wife's chattels, brought this suit in equity against the appellants for enjoining the publication of *any* of the said letters, and for compelling the surrender of *all* of them to himself.

His petition, without intimating that the publication would affect the memory of his wife, or in any way subject *him* to loss or annoyance, claims that he is entitled to those letters, either as administrator or surviving husband; and nowhere, as mere author, does he claim the *possession* of the letters written by himself.

As to all her letters, he says : " The letters are valuable and useful to him ; and, *as administrator of his wife and as surviving husband*, he is entitled to their *possession*." This is the only asserted title to the possession of any of the letters. As to business papers, consisting of accounts and receipts for her own expenditures for herself and family, and which the appellants surrendered to him by their answer, his petition says :

" The plaintiff is advised that said papers, at the time of removal, being in the actual custody of his wife, were legally in *his* possession, and were *legally* HER *property*. That if he is .not, as husband, the owner . of them, still, as survivor of his wife and as administrator of her estate, he is *entitled to them*. That, as the writer of those letters addressed to his wife, he is interested in their contents, and is entitled to be *guarded against any improper use or exposure of those confidential communications*."

Thus, while he claims title to the possession of the accounts and receipts, he does not, *as author*, claim title to the possession of the letters written by himself, but only an injunction or other safeguard against their publication.

The answer by the appellants denied his right to any of the letters in any one of his threefold characters, and claimed that the respondent, *Mrs. Grigsby*, was entitled to their custody and curation as a sacred deposit confided to her by her dying mother to keep. The circuit court perpetually enjoined the publication and ordered the surrender to appellee of the letters written to his wife by himself, and also of all letters received by her from *other persons during their intermarriage*.

The revision of that judgment involves interesting considerations of principle, analogy, and policy.

As the judgment excludes letters received before the last marriage, except those written by the last husband, and includes all letters received during that marriage, the circuit judge did not consider the appellee's authorship the sole test of his right, but must have thought that, either as administrator or husband, he was entitled to relief as to all letters received by his wife from others as well as himself while she was his wife. And even on this hypothesis, the judgment is unreasonable and inconsistent; for, if any of her letters passed to him either as administrator or husband, the right was so devolved on him only because she had some special property in them as her own; and having the same title to all her letters, whenever and from whomsoever received, he had, as administrator and husband, precisely the same right to all, and therefore to those received from her first husband and other friends before her last marriage. All the letters, including those written by the appellee before and

during his intermarriage with *Virginia Shelby*, are described in his petition as merely friendly and confidential communications containing nothing which could, if published, affect his interest or his character. There is property in even such letters. By sending them, the authors parted with their right to the possession, control, or reclamation of them without her consent, and gave her the exclusive right to read and keep them for their enduring memories and sentiments.

This was *her* property, which might have been peculiarly valuable if estimated by only *affectionis pretium*, often exceeding the cash value. The authors also retained a qualified property in their contents which they alone had the right to publish for their own benefit; and therefore, and also because they reflected their emotions and sentiments, they had the right to enjoin publication by the recipient or any other person. This was the *author's* property to *its full extent*.

These correlative rights of property are now established by abundant authority, fortified by principle and analogy.

The ancient common law recognized the exclusive right of the author of a *literary* manuscript to publish it for his own profit. That venerable code being silent as to private letters, it was long a debatable and controverted question whether the same principle applied to them, and defined this reciprocal right of author and recipient. But, as such a manuscript may possess literary merits worthy of publication, and the author should have the right to decide for himself whether the publication would be useful to the public and profitable to himself, and as the letter, whether literary or not, is a transcript of his own mind, the modern common law, moulded by the power of adaptation and expansion, seems now to be

Grigsby and wife vs. R. J. Breckinridge.

identical with the ancient, and applies the same doctrines to private letters—the same reasons, when sifted and expanded, apparently applying to each class of manuscripts equally and alike.

A production of the mind is property in every essential sense in which a production of the hands is the producer's property. And consequently in England, the mother of the common law, all her jurists and courts have long recognized the exclusive right of the author to publish his own literary manuscript; and, as it is a reflex of his own mind, and the publication of it may be profitable, the same authorities treat the right to publish as his *property* to that extent. But, as ordinary letters of friendship, or on business, may not be fit for profitable publication, many jurists and judges, ancient and modern, have denied that their authors, after delivery, have any property in them, and adjudged the entire property to be in the recipient. Nevertheless, the modern common law, as expounded by preponderating authority, seems to recognize the author's right to publish even such letters as *his property* to the extent of that right, which he may protect by injunction against piracy or intrusion. And this may sufficiently appear from the following citations, *British and American:*

BRITISH:—*Pope vs. Curl,* 2 *Atkins,* 342; *Webb vs. Rose,* 4 *Burrows; Thompson vs. Stanhope, Ambler,* 737; *Forrester vs. Waller, Brown's P. C.; Geé vs. Pritchard, Swanston,* 42; *Earl of Granard vs. Dunkin,* 1 *Ball & Beatty,* 207; *Millar vs. Taylor,* 4 *Burrows.*

AMERICAN:—*Woolsy vs. Judd,* 4 *Duer's New York Reps.,* 380; *Folsom vs. Marsh,* 2 *Story's Reps.,* 100; *Story's Eq. Jur.,* sections 943 *to* 949, *inclusive.*

These consecutive cases, filling a century, and authenticated by such names as *Hardwicke, Bathurst, Mansfield,*

*and Eldon, in England,* and *Story,* backed by the volumin-
ous and able opinion in the case of *Woolsy vs. Judd, in
America,* are not only very persuasive, but should be held
by this court as conclusive against the conflicting opinions,
comparatively few, inconsistent, and inconclusive. The
cited cases recognize in the recipient of a private letter,
sent without any reservation, express or implied, the gen-
eral property, qualified only by the incidental right in the
author to publish and prevent publication by the recipient,
or any other person. And, as thus defined, such, and only
such, is established as the property of each. And this
general property implies the right in the recipient to keep
the letter or to destroy it, or to dispose of it in any other
way than by publication—the unqualified delivery of
the letter being adjudged a gift of all the author's right
to it, except his right to publish if existing, and to prevent
the publication of it without his consent. The author
and the recipient cannot hold a joint property, because
that would entitle each to the possession, which, as to
such a thing, would be absurd; nor, consistently with the
adjudged cases, could the recipient's property, like that of
a bailee, be special, because that would imply an uncer-
tain right carved out of an undefined general property of
the author, contrary to the principle recognized by all
consistent jurists. The author's right to publication or
non-publication being deemed his property, and only
property, the protection of that property is the only
adjudged ground of injunction against publication with-
out his consent. Courts of equity have not yet assumed
jurisdiction to enforce duties merely moral, or to prevent
a breach of epistolary confidence or exposure of an
epistolary secret in no way affecting any interest in *prop-
erty*—however inconsistent such publication may be with
honor or pure ethics. But the sole ground yet recognized

for injunction is the protection of *property*. In the case of *Gee vs. Prichard, supra, Lord Eldon* said : "The argument has confirmed doubts which have often passed in my mind relating to the jurisdiction of this court over the publication of letters; but I profess this principle, if I find doctrines settled for forty years together, I will not unsettle them. I have the opinions of *Lord Hardwicke* and *Lord Apsley*, pronounced in cases of this nature, which I am unable to distinguish from the present. These opinions have been acquiesced in without application to a higher court."

Subsequent cases in England and America have conformed to that discreet recognition of *stare decisis*, and that eminent chancellor added: "The doctrine is thus laid down following the principle of *Lord Hardwicke:* I do not say I am to interfere because the letters are written in confidence, or because the publication of them may wound the feelings of the plaintiff; but if mischievous effects of that kind can be apprehended in cases in which this court has been accustomed, on the ground of *property*, to forbid publication, it would not become me to abandon the jurisdiction which my predecessors have exercised and refuse to forbid it—such is my opinion." He further added: "The question will be, whether the bill has stated facts of which the court can take notice as a case of *civil property*, which the court is bound to protect. *The injunction cannot be maintained on any principles of this sort, that if a letter had been written in the way of friendship, either the continuance or discontinuance of their friendship affords a reason for the interference of this court.*"

And *Story, in second volume of his Commentaries, section* 948, says: "The only ground upon which jurisdiction has been maintained is a right of property, literary or otherwise, in the writer of the letter." To the same

effect are the American cases of *Wetmore vs. Scovill*, 3 *Edward's Chy. Rep.*, 315, *and Hoyt vs. McKensie*, 2 *Barbour's Chy. Rep.*, 320.

A majority of the American cases even deny the right of the author to enjoin the publication of a private letter on the ground of property. But, as before suggested, we incline to the conclusion that the weight of authority, fortified by analogy, preponderates in favor of the author's special property in the publication, and in his consequential right to publish *if he keep or can procure a copy. But the recipient is not bound to keep the original for his transcription, inspection, or other use. There is no adjudged case or elementary dictum extending the author's right of property beyond this circumscribed and contingent range. And all the cases cited in this case thus limit and define it.*

Publication by the author is circulation before the public eye by printing or multiplied copies in writing. The like publicity by the act of the recipient would be an infringement of the author's exclusive right, which he may prevent by injunction. Publication is the same thing in kind, whether by the author or the recipient, and consequently the recipient may read the letters to a friend or deposit them for safe-keeping without violating the author's right of publication. See also *Duke of Queensberry vs. Shebbeare*, 2 *Edin. Reps.*, 329, *concerning Clarondon's History of the Rebellion; Southey vs. Sherwood*, 2 *Merivale, concerning Southey's "Wat Tyler;" Macklin vs. Richardson, Ambler*, 694 ; *Coleman vs. Wathan,* 5 *D. & E.*, 245; *Bartlette vs. Crittenden*, 4 *McClean's C. C. Reps.*, 300.

Consequently, as the author's right to this kind of publication of a letter is the only property which may be protected by injunction, the recipient may rightfully make any use of the letter which will not, in the same sense, amount to publication, without violating the au-

thor's exclusive right or entitling him to enjoin such lawful and consistent use.

In an able article on the author's right to enjoin the publication of private letters, *Parker*, an eminent judge in Massachusetts and professor in the *Harvard* law school, said:

" The receiver of a letter is not a bailee, nor does he stand in a character analogous to that of a bailee. *There is no right to possession, present or future, in the writer.* The only right to be enforced against the holder is a right to prevent publication, not to require the manuscript from the holder in order to a publication by himself.

" The right of the receiver, then, is to the whole letter. He may read it himself and to others, and recite it at meetings. He may do every thing but multiply copies, and perhaps he may do this, if he do not print them."

His argument, published in the Law Register of June, 1853, with Redfield's apparent approbation, is very able, and is entitled to respectful consideration. With some slight exceptions, it harmonizes with our own views, and fortifies our own conclusions.

As already shown, in all the adjudged cases there is not even an intimation of the author's right to the possession or control of a private letter addressed to a friend, and no such title would be compatible with any of those cases, because it would. be inconsistent with any exclusive right as adjudged by all of them to be in the receiver. The universally admitted title of the receiver to the paper necessarily involves and implies the title to it as given and received with the manuscription upon it, which is the soul of the letter, and the enjoyment of which, with all its suggestive associations and endearing memories, was the object of sending it to the

chosen recipient.   And, moreover, the simple fact that
the author may enjoin the publication of all such letters,
implies that, as mere author, he cannot, by suit, recover
the possession; because, as the injunction is a frail se-
curity, the author, if entitled to the possession, would
prefer to sue for *that* as the only safe assurance, and
would not, *as in all the cases*, sue for an injunction only
and depend on that alone.

Thus we see the essential and characteristic difference
between the right to enjoin publication and the right to
compel a surrender of private letters, and the equally
apparent and vital distinction between the author's
property resulting from his right to enjoin and the re-
cipient's property arising from his right to keep.   *And
the cases establishing the first not only do not apply to the last,
but, by inevitable implication, establish it, even if there had
been no express adjudications to the same effect.*   And it
seems to us that principle, analogy, and authority equal-
ly establish the right of the recipient of all such letters
to keep and read them whenever, like an *album* of pho-
tographs, the inspection of the chirography and perusal
of the contents, with all their reminiscences, may sug-
gest cherished recollections or excite pleasurable emo-
tions.   And this right might in many cases, like the
present, be invaluable property in the holder.   As a
logical sequence, this peculiar property, exclusively and
essentially personal, may be disposed of according to
the holder's discretion, subject only to non-publication
to the *public* gaze in such a manner as to violate the
author's exclusive right.

When any such letters, as those in this case may be
presumed to be, are interesting reminiscents of friends
living and dead, they are more prized by the true owner
than by any other person.   Who else as certainly as

Mrs. Breckinridge could be as much interested in often reading the letters written to her by her first husband when she was a girl and when she was his wife, and which she had so carefully preserved for that purpose? And who else could be as much concerned to read and preserve those written to her by her last husband when she was a widow and when she was his wife?

Such was the character and such the extent of her property in the letters confided to the custody of her only daughter, and it would be mockery to call it *her* property if it be of less extent or legally subject to the control of her husband. Its peculiar character and dedication eminently distinguish it, like jewels, as her separate property, which she had the right, as between herself and husband, to keep and dispose of regardless of his will. And, as already indicated, her testamentary deposit of them with her daughter, to keep as memorials of her mother and her correspondents, was no wrongful publication of them.

It seems to us, therefore, as a necessary consequence of the foregoing principles and authorities, that the appellee's wife, when she was about to die, and could not, by her own custody, preserve her letters any longer, had a right to secure their continued preservation and enjoyment by a gift and delivery of them to her own daughter, to keep and enjoy, and whom she seemed to prefer to her surviving husband as the custodian of a deposit so consecrated by her feelings and long possession and usufruct *with his acquiescence in her asserted right until after her death.* And, by that solemn transfer and sacred trust, she passed all her own right as separate property in perpetuity. Consequently, none of those letters, after that irrevocable alienation, constituted any portion of her intestate estate which, if they could have been appreciable as assets,

could have passed to the appellee as her administrator. Nor, for the same reasons, could they have survived to him as husband. He has no better right to control the letters of which he was the author than the others. In the letters he wrote to his wife before and during their intermarriage he had a peculiar property, which, to the extent of enjoining publication, he might make available; and to that extent the judgment is approved as allowable. But he has not prayed for a surrender of those letters, and would not, if he had sought it, have been entitled to it. Nor could we admit that, in this age and country, a husband's rightful authority gives him, during marriage, dominion over his wife's chaste and friendly correspondence not affecting *his* rights; nor that, in all the plenitude of his marital power, he could, without her free consent, take from her, or destroy, or in any way control, the possession or gift of such letters. Any such ungracious interference with her confidential correspondence would impair social confidence and disturb domestic peace, and ought not to be encouraged by the judiciary, especially as it could do him no other good than to gratify a jealous and prying curiosity. According to befitting decorum, and in every valuable sense, such letters written to her to keep and read and cherish are hers ; and if she, for reasons satisfactory to her own taste and judgment, choose not to give or show them to her husband, she has a right to keep them to herself as her own inviolable property ; and a confiding wife will never withhold from a true husband her confidential letters without some good and sufficient reason.

The existing code of both British and American law recognizes the personal individuality and moral responsibility of wives, and, consequently, guarantees their freedom of thought and of interchange of sentiments. Their

ideas are their own, their emotions their own, and their affections their own. Here and now a husband must not be a tyrant, and ought not to be a spy over his wife, who is neither his slave nor his mistress, but should always be his free and equal companion. What law or policy gives her letters to him? And what property can he own in that which is of no appreciable value to him, and is, for every purpose of use and safe-keeping, hers?

As the appellee's transmission of his letters to his wife, without express limitation on her or reservation to himself, implied a gift to her separate use in any way except by publication, he could not, during her life, have compelled her to surrender them to his control or possession; and his apparent acquiescence in her exclusive possession and use until her death, conclusively fortifies that legal presumption. During all that time his only right was to procure copies for publication by himself, if he had chosen to publish them as author, or to enjoin publication by herself. And had she not given them to her daughter, his right as author would not have been greater or better after than before her death. Her gift transferred her general property to her daughter, subject only to his right of publication and the donee's obligation never to publish. The death of his wife gave him no other right. He still has the same and only the same right to publish or enjoin publication on the ground of his special property, resulting alone from his right to publish, and in no degree from any apprehension of an exposure not affecting that special property. His right to enjoin publication still remains unimpaired. But, as author, he has no right to the possession of the letters.

As to her other letters, the authors alone could enjoin publication; and, as she parted with all her right to them, no other person than her transferree has any legal right

to their custody. That transfer to keep was not publication; but, could it be so construed, it would only illustrate his right to an injunction.

We are therefore of the opinion that, while the appellee was entitled to an injunction against the publication of the letters written by himself to his wife, he was entitled to none to prevent the publication of any of her other letters; and we are of the opinion, also, that he was not entitled to a judgment for a surrender of any of her letters.

Wherefore, the judgment is reversed, and the cause remanded, with instructions to enjoin the publication of the letters of which the appellee was author, and to dismiss the petition as to all else.

---

JUDGE WILLIAMS DISSENTING FROM THE OPINION OF THE MAJORITY OF THE COURT, DELIVERED THE FOLLOWING OPINION:

This was an action brought by Breckinridge in the court below to obtain the possession of letters which he avers, that *"during his married life with his said wife he was in the habit of writing to her letters, as also about two years previous to their marriage ; the letters so written by him to his wife amounted to several hundred in number, which letters were preserved by his wife."*

He also avers " that his wife, before and during their marriage, had a large correspondence with an extensive circle of friends, whose letters she also preserved." Also, that she had the expenditure, at her discretion, of about two thousand dollars annually, and that " she kept and preserved the accounts and notes paid by her, and the written evidences of the expenditure of that amount," which were " numerous and of pecuniary value to plaintiff."

He avers that he believes "that those papers were removed by defendant, Susan P. Grigsby, to the residence of herself and husband, where they still are." And that he is advised "that said papers, *at the time of removal, being in the actual custody of his wife, were legally in his possession and legally his property.* If he is not, as husband, the owner of them, still, as survivor of his wife and as administrator of her estate, he is entitled to them. *That, as the writer of those letters addressed to his wife, he is interested in their contents, and is entitled to be guarded against any improper use or exposure of those confidential communications.*"

He prays "*that the defendants may be required to surrender to him all letters written by him to his late wife, Virginia, both before and after their marriage*, and all other letters received by her during their marriage; also, all other papers, writings, and documents in the custody of his wife, and taken possession of by defendants."

I have made these quotations to show that Breckinridge set up claim to these letters and papers in the character of *author*, surviving husband, and administrator of his deceased wife, and prayed specifically for a return to *him* of all, not in the character of husband or administrator, but in any and all of his rights; and he then prays "that said defendants, *in the meantime*, be enjoined from destroying, delivering to others, or publishing in any way, said letters and papers or any of them."

To say, then, that he "*claims that he is entitled to those letters either as administrator or surviving husband, and nowhere, as mere author, does he claim the possession of the letters written by himself*," is a clear misunderstanding of his assertion of right and title. If Mrs. Grigsby obtained them wrongfully, either by or without the consent of Mrs. Breckinridge, then her possession was an "*improper*

*use*" *of,* and "*exposure*" of them, which the court should remedy.

The pleadings of the parties constitute the whole case; no witness was examined for either party. There is a question as to whether the defendant's answers are to be treated as a deposition, and therefore evidence, which will be examined.

September 9, 1859, and before answer, the plaintiff filed an amended petition, in which he sets out the letters and papers he is seeking to obtain:

"1st. Letters written by plaintiff to his late wife, Virginia Breckinridge.

"2d. Letters written by many and various persons to his late wife, both before and since her marriage with the plaintiff.

"3d. And accounts and notes and memoranda of moneys paid out and expended by her."

He also alleges that said papers and letters have been removed, and "calls on the defendants to answer and disclose whether they received and removed any, and what letters, written by plaintiff to his late wife," and also as to the others; and some other specific inquiries are put to call their attention directly to the facts, and alleges that he cannot, except by the discovery and statements on oath of the defendants, *ascertain the number and dates of the letters* and by whom written," &c.

To these petitions the defendants subsequently responded, and profess to give a list, but which is not in the record, and say "that they have no other papers which can throw any light whatever on the course of administration." They admit that she had a numerous correspondence, and had received many letters which had been preserved, and alleged that "some time prior to Mrs. Breckinridge's death, and having full authority to do so,

she placed in the hands and custody of defendant, Susan P. Grigsby, a number of letters received by her—Mrs. Breckinridge—at various times in her life, and reaching over a period of many years, *some of which were received from the plaintiff both before and during their marriage,*" and some from others, including her first husband, Alfred Shelby.

To this answer four exceptions were taken; also, another amended petition filed, in which many of the letters written by the plaintiff to his wife, before and subsequent to their marriage, were specified by the date of month and year written; and he calls on them to answer, " on oath," whether they had received and then had such letters, what they did with the letters, and who now has them, and that they " state freely all about said letters, and all other letters written by the plaintiff and others to his late wife, Virginia Breckinridge, received by them."

To this they responded, that "the defendants answer plaintiff's petition as amended, and say that Virginia Breckinridge, late wife of plaintiff, was formerly the wife of Alfred Shelby, deceased, and that the defendant, Susan P., was the daughter of said Virginia and Alfred Shelby." Alleged that she had quite an extensive correspondence with her friends. Many of the letters were received whilst she was single, and many during both of her marriages; that, " shortly before the death of Mrs. Virginia Breckinridge, she collected quite a number of these letters, *part of which were written to her by plaintiff, both before her marriage to him and also afterwards;* deposited the same in a box, and gave them to defendant, Susan, *all of which were of a private and personal character,* and none of which, as the defendants believe and charge, *are in anywise valuable or necessary to the proper administration of the estate of said Virginia Breckinridge.*" They

VOL. II—32

further say they are "unable to state whether such letters of the dates designated are in the box containing the letters given to the defendant, Susan, by her mother;" and that, "in the gift aforesaid, the said Virginia only exercised the rightful power which she had over her own correspondence, and such as married women, in her state and condition of life, could rightfully do."

To this answer, Susan P. Grigsby alone made the following affidavit: "The defendant, Susan P. Grigsby, *says she believes the statements of this answer are true.*"

To this, as well as the other answer, some four exceptions were filed, and, without any other proof, the cause was submitted for trial, and the court adjudged a return to the plaintiff of all letters received by his wife from himself, whether before or after marriage, and for all letters received from others after their marriage.

There were no interrogatories affixed to any of the plaintiff's pleadings for the defendants to answer, but all were contained in the body of the pleadings, and treated by both parties as part of the pleadings; and to show this the more certainly, the prominent parts of each pleading of the parties have been stated.

By *subdivision* 3, *section* 118, *Civil Code*, " a statement in ordinary and concise language, without repetition of the facts constituting the plaintiff's cause of action," must be set out in the petition.

By *section* 153, " every material allegation of the petition not specifically controverted by the answer, and every material allegation of new matter in the answer constituting a counter-claim or set-off, not specifically controverted by the reply, must, for the purposes of the action, be taken as true. *But the allegation of new matter in the answer not relating to a counter-claim or set-off, or of new matter in a reply, is to be deemed as controverted by the*

*adverse party, as upon a direct denial or avoidance, as the case may require.*"

By *subdivision* 2, *section* 125, the answer must contain " a denial of each allegation of the petition controverted by the defendant, *or of any knowledge or information thereof sufficient to form a belief.*"

Now tested as a pleading, neither of the answers were sufficient to controvert the specific allegations of the petition that the plaintiff had written his wife letters on given days of the month and year, and numerous other letters which dates he could not give, and that his wife had preserved these; for the defendants neither admit they have such letters nor deny having them; nor do they say they have no sufficient information upon which to form a belief that they did not have them, but content themselves with making the general and wholly insufficient statement, that " *the defendants are unable to state now whether such letters, of the dates designated, are in the box containing the letters given to defendant Susan by her mother.*" What did it matter whether the letters were in the box or elsewhere, if they were in the defendant's possession? whether in or out of the box was wholly immaterial; and upon this state of pleadings the defendants should have been ruled to make their answer more specific.

*Section* 167 provides, that " in actions by equitable proceedings, either party may *annex* to his petition, answer, or reply, written interrogatories to any one or more of the adverse parties, concerning any material matter in issue in the action, the answer to which, on oath, *may be read by either party as a deposition between the party interrogating and the party answering.*"

By *section* 168, " the party answering shall not be confined to responding merely to the interrogatories, but may state any new matter concerning the same cause of action, which shall likewise be read as a deposition."

By *section* 672, " in actions by equitable proceedings, a party answering interrogatories may, before the trial, file his written statement, under oath, concerning such new matter, which shall be read as a deposition."

By *section* 174, " the party, in answering such interrogatories, *shall distinguish clearly between what is stated from his personal knowledge and what is stated from information or belief merely.* An unqualified statement of a fact shall be considered as made of his personal knowledge."

By *section* 175, " the answers to the interrogatories shall be *verified by the affidavit of the party answering, to the effect that the statements in them made of his own personal knowledge are true, and those made from the information of others he believes to be true.*"

There are several substantial objections to reading the answer as Mrs. Grigsby's deposition.

*First.* No interrogatories were annexed to the petition, and she was not required to answer in the nature of a deposition by the plaintiff, but merely required to answer specific allegations and inquiries as a pleading; and, as decided by this court in *Bennett vs. Garrett, &c.* (18 *B. Mon.,* 71), she was under no obligation to answer them as a pleading. Therefore, if she voluntarily did so do, she could not, if she desired, thereby turn her pleading into a deposition, to be read at her own option.

*Secondly.* But she did not put her answer in as a response to interrogatories, but as a pleading. Her affidavit to it shows she treated it as a pleading and not as a deposition; for it is sworn to as a pleading, and not one of the requisites to make it a response to interrogatories was observed.

*Thirdly.* But had she responded as to interrogatories, yet it could only be read on the part of defendants at their own option. If the plaintiff had declined to read

it as a deposition, then the defendants could have had it read as a deposition; but the court could not, of its own mere motion, read it as evidence, much less can this court so read it for the first time, when nothing in the record shows that either party or the court below so read it. But all the record goes to negative this. I do not therefore regard these answers as a sound, pertinent, legal pleading, much less specific responses to annexed and direct interrogatories. There must be something in the record or actings of the parties which shows an intention to use it as a deposition, else the court cannot so use it.

If this be correct, Mrs. Grigsby has not the shadow of any evidence establishing that Mrs. Breckinridge ever gave her these letters; and, whilst she confesses to their possession, and thereby waives any issue as to that, yet, as she asserts a gift to her, she must prove it, as it stands denied by the provisions of *section* 153.

But whether Mrs. Grigsby's answer be or not regarded as a deposition, and whether she is to be regarded or not as having obtained by gift from her mother the letters written by the plaintiff to his wife, she has no legal right to retain them against his claim.

There is nothing acrimonious in this record; neither party has alleged any improper conduct against the other. As to the family and connubial relations, there is nothing in the record inconsistent with the most confidential, kind, and affectionate personal relations between Breckinridge and his late wife. Personally, I know nothing otherwise. As a judge, I can legally know nothing not appearing in the record. It is then a simple, naked, legal question, whether a wife can, by gift to an alien to her husband's family, part with his social confidential letters to her, and thus put them beyond his reach, sub-

ject to the gaze of the idle and the curious, and liable to the animadversions of the illiberal and the unfriendly equally with those well-disposed toward him.

This is the first case, so far as is known, wherein the direct question as to the right of custody of the letters written by the husband to his wife, or any other writer of letters, has been brought for adjudication after the death of the wife or other receiver. None of the cases referred to by the majority of the court, or referred to by the counsel on either side, involved the direct and immediate question of who was entitled to the possession of social friendly letters after the death of the receiver; and we must settle the law upon its true philosophic analogies, and not upon rhetorical figures and platitudes. And though it be conceded that a married woman's ideas, emotions, and affections are her own, and that her husband should neither be a tyrant nor a spy over her, who is neither his slave nor his misstress, but his free and equal companion; still, when she has ceased to live; when no longer capable of emotions and affections; no longer his free and equal companion, but a lifeless, listless, lump of clay; when the intelligent, life-inspiring spirit has fled from its earthly habitation, who has, or can have, as good right to his own compositions, his own confidential, social, and affectionate letters to his wife, before or after marriage, as the husband? And what principle of social rights or social delicacy should ingraft upon our jurisprudence the legal right in the wife to put those letters beyond his reach and control, when not necessary to establish or perserve any property right, nor vindicate character or repel unjust accusations? Neither party in this suit avers any such foundation of claim. As a starting point, let us examine what the character of property in letters or other manuscripts is, held by the

author and the receiver. As early as Lord Hardwicke's time, that able and learned English jurist, in *Pope vs. Curl* (2 *Atkins*, 342), said: "I am of opinion that it is only a *special* property in the receiver. Possibly the property in the paper may belong to him; but this does not give license to any person whatever to publish them (the letters) to the world; *for, at most, the receiver has only a joint property with the writer.*" And this is quoted by Judge Story with approbation; and the American law laid down by him in almost the identical words of Lord Hardwicke, in *section* 944, 2d *volume Story's Equity Jurisprudence;* and in section 945 Story says: "In a comparatively recent case, Lord Eldon has explained the doctrine of courts of equity on this subject to be founded, not on any notion that the publication of letters would be painful to the feelings of the writer, *but upon a civil right of property,* which the court is bound to respect. *That the property is qualified in some respects;* that, by sending a letter, *the writer has given, for the purpose of reading it, and in some cases of keeping it, a property to the person to whom the letter is addressed; yet that the gift is so restrained, that, beyond the purposes for which the letter is sent, the property is in the sender.* Under such circumstances, it is immaterial whether the intended publication is for the purposes of profit or not. If for profit, the party is then selling. *If not for profit, he is then giving* that, a portion of which belongs to the writer."

There is nothing clearer than that the English courts, and Story, as a high American authority, treat the *general* property as being in the writer, and the *special* property in the receiver.

What is the extent of the gift made by the *writer* to the *receiver* in sending the letter? Let Story answer: "By sending a letter the writer has *given, for the purpose of*

*reading it, and in some cases of keeping it, a property to the receiver; yet the gift is so restrained, that, beyond the purposes for which the letter is sent, the property is in the sender."*

And I hazard the opinion that not a single case, now recognized as authority, either in England or America, has ever gone to the extent of recognizing the right in the receiver, during his life, of bestowing the property in the letter on another; more especially have they not when the receiver's right to read and retain was about to expire by the termination of his or her life, to bestow the property in fee simple upon another.

That the entire property is in the author until sent to the receiver is agreed by all courts and writers upon jurisprudence, without contrariety. By sending it, he parts with a special, limited property, and bestows this upon the receiver for a few limited purposes. Who, then, logically, must have the general property—the one who has a limited right for particular purposes, or the one who has the right to publish it, and an unlimited right to use it for any and all purposes?

To say that the receiver has the general, and the writer the special property, would seem equally to lack the authority of logic and of law.

But suppose the rights of the respective parties be put upon joint ownership, the logical and legal result would be, that the survivor of joint-owners of personal property has the right to its possession and control; and this is the universal rule, unless, because of insolvency or fraud, the chancellor should interpose to keep the surviving joint-owner from taking possession.

But the property of the receiver of letters, unless these be necessary to vindicate rights of property or character, or repel unjust aspersions, in its very nature, is essentially a life estate, the only purposes being for the indi-

vidual to whom sent, and peculiarly personal to the receiver; hence, when the receiver dies, the whole *special* property in him is extinguished, and then, not only the general, but the entire property, is in the author.

This logical and legal result was met, and, at one time, overruled in England by Vice-Chancellor Sir Thos. Plumer (*Lord and Lady Percival vs. Phipps et al.*, 2 *Ves. & Beam.*, 19), after the law had been settled for three quarters of a century by Lord Hardwicke, in which, *though not essential to the case*, he denied any property in the writer of private and social letters not intended for publication, and dissolved an injunction which had been granted by Lord Eldon.

But in the subsequent case of *Gee vs. Pritchard*, 2 *Swanston*, 402, Lord Eldon, with a clear and overwhelming logic, firm hand, but gentle and respectful language, swept away the unsubstantial and illogical theories of Vice-Chancellor Plumer; since which, the case of *Percival vs. Phipps* has ceased to be regarded as authority in England.

If these cases stood on simply the authorities of the judges rendering them, what well-informed court could for a moment consider Plumer as against Eldon? As to Plumer, it will be sufficient to quote from the private diary of Sir Samuel Romily:

" A worse appointment than that of Plumer to be Vice-Chancellor could hardly have been made. He knows nothing of the law of real property, nothing of the law of bankruptcy, and nothing of the doctrines peculiar to courts of equity." (*Memoirs of the Life of Sir Samuel Romily, vol.* 2, *p.* 310.)

An enlightened English judiciary has never since considered *Percival vs. Phipps* as even slight authority. This decision, however, was followed by Vice-Chancellor Mc-

Coun, of New York, in *Wetmore vs. Scovill*, 3 *Edwds. Chy. R.*, 515, and by Chancellor Walworth, of New York, in *Hoyt vs. McKenzie*, 3 *Barb. Chy. Rep.*, 314.

But both of these have been subsequently overruled by the supreme court of New York, in the case of *Woolsey vs. Judd*, 4 *Duer*, 382, decided in 1855; since which they have ceased to be regarded as authority in New York, and should cease to be so regarded in Kentucky.

In this latter case the able and exhaustive opinion of the court by Judge Duer has most thoroughly annihilated the reasoning of Plumer, McCoun, and Walworth, and triumphantly exhibited that the decisions rendered by them were unsustained by authority, contrary to the analogies of the law, and disregardful of the rules of logic.

As the cases of *Percival vs. Phipps*, *Wetmore vs. Scovill*, and *Hoyt vs. McKenzie*, have ceased to be authority in the Kingdom and State where rendered, I shall neither respond to their reasoning, quote them, nor regard them as authority in this State for any purpose. For in the legal world these may be regarded as the ephemeral, vanishing meteor, which shines for an instant, explodes, and is forever dark; whilst those great jurists, who have settled the law upon philosophical principles of justice, like the star-gemmed heavens, continue to radiate their light upon the pathway of time.

And as these are the only British or American authorities which deny the right of the author to enjoin the publication of a private letter on the ground of property, I cannot agree with the majority of the court in saying, " *A majority of American cases deny the right of the author to enjoin the publication of a private letter on the ground of property.*"

But so far from this being the case, there is not a single American authority which now denies this right, which

has been brought to view.   Even Parker, the Massachusetts Judge and Professor, recognizes this whilst he says: "The right of the receiver, then, is to the whole letter.   He may read it himself and to *others* and *recite it at meetings; he may do everything but multiply copies; and perhaps he may do this if he do not print them*," which is even more obscure and more at war with the analogies of the law than were the overruled English and New York cases, and which I suppose never entered the mind of any but a New England transcendentalist.

He evidently confounds *publication* with that of *printing*, and makes them synonymous.   From what jurisprudence he learned this I know not, nor can I comprehend such a principle.   If *reading letters at a public meeting* and *multiplying copies* and placing them in the hands of others are not publication, then I confess my entire ignorance of both the legal and ordinary meaning of the term.

Bouvier (2d vol. *Law Dic.*, 400) says publication " *is the act by which a thing is made public*."   " Publication has different meanings."   "When it refers to a libel, it is its communication to a second or third person, or a greater number."   Such is the legal meaning of the term.   Webster says it is " the act of publishing or offering to public notice; *notification* to a people at large, *either by words, writing*, or *printing;* proclamation ; divulgation ; promulgation."

Professor Parker has therefore disregarded both the legal and philological meaning of the term.   As said by the supreme court of New York in *Woolsey vs. Judd*, " there is probably no doctrine which, as general, is more fully sustained, and, indeed, established by authority, than that the author of an unpublished manuscript has an exclusive right of property therein at common law—a right which entitles him to determine for him-

self whether the manuscript shall be published at all. * * * The language of the text-writers is uniform and positive; the decisions numerous and express;" and refers to as—

BRITISH:—*Forester vs. Waller*, 2 *Brown*, 138; *and by Lord Mansfield*, 4 *Burr*, 2, 320; *Webb vs. Rose, same; Donaldson vs. Becket, same*, 2, 508; *Duke of Queensberry vs. Shebeare*, 2 *Eden's Chy. R.*, 329; *Southey vs. Sherwood*, 2 *Mer.*, 334.

AMERICAN :—*Wheaton vs. Peters*, 8 *Peters' S. C. R.*, 591; *Eden on Injunctions*, 595, 296; *Story's Eq. Jur., section* 943; *Curtis on Copyright*, 84, 150, 159.

This being the settled law as to manuscript compositions unpublished, which, in their nature, might be presumed as written for publication, the next question came up, how far these rules applied to mere private letters on business, or on family concerns, or on matters of personal friendship.

Story (*Equity Juris., sec.* 946) says: "In a moral view, the publication of such letters, unless in cases where it is necessary to the proper vindication of the rights or conduct of the party against unjust claims or injurious imputations, is, perhaps, one of the most odious breaches of private confidence, of social duty, and of honorable feelings, which can well be imagined. It strikes at the root of all free and mutual interchange of advice, opinions, and sentiments, between relatives and friends and correspondents, which is so essential to the well-being of society, and to the spirit of a liberal courtesy and refinement. It may involve whole families in great distress, from the public display of facts and circumstances which were reposed in the bosoms of others under the deepest and most affecting confidence that they should forever remain inviolable secrets. It may do more, and compel every one, in self-defense, to write, even to his dearest

friends, with the cold and formal severity with which he would write to his wariest opponents or his most implacable enemies."

And in *section* 947 he says: "It would be a sad reproach to American jurisprudence if courts of equity could not interpose in such cases, and if the rights of property of the writers should be deemed to exist only when letters were literary compositions. If the mere sending of letters to third persons is not to be deemed, in cases of literary composition, a total abandonment of the right of property therein by the sender, *a fortiori*, the act of sending them cannot be presumed to be an abandonment thereof in cases where the very nature of the letters imports, as matters of business, or friendship, or advice, or family or personal confidence, *the implied or necessary intention and duty of privacy and secrecy.*"

And in section 948 he says: "Fortunately for public as well as private peace and morals, the learned doubts on this subject have been overruled; and it is now held that there is no distinction between private letters of one nature and private letters of another."

In *Falson vs. Marsh* (2 *Story's R.*, 100), Judge Story adjudicated the right of property as existing in the writer to the same extent in mere friendly, family, and social letters, not designed for publication, or of literary compositions in manuscript, because every letter, no matter how defective in composition or trivial in subject, is a literary composition in the legal sense of the term.

In *Thompson vs. Stanhope* (*Ambler*, 737), the executors of Lord Chesterfield filed a bill to enjoin the publication by the widow of his son of those celebrated letters which, for a series of years, he had written to her husband; also, the publication of certain characters which he had drawn in writing of some of his contemporaries. The defendant put in for defense that Lord Chesterfield had himself

given to her both the letters and characters; but Lord
Asply, afterward Lord Bathurst, sustained the injunction
against this publication. Here was a case in which the
writer, after the death of the receiver, obtained the posses-
sion of the letters, and gave them to the deceased receiv-
er's surviving widow; and even then the court exerted its
power to prevent publication. The fact that the defense
was predicated on the gift by the sender after the death
of the receiver, and the further fact that the court made
no comments in derogation of this title, strongly implies
that both the English lawyers and courts in such case
recognizes the entire property, with the right of disposi-
tion, in the surviving writer.

In *Gee vs. Prichard* (2 *Swanston*, 402), the plaintiff was
a widow lady, and the defendant the natural son of her
late husband; they had lived together for many years on
terms of great intimacy and kindness; but differences
had finally arisen between them relative to her husband's
estate, when, at her request, he returned to her the orig-
inal letters, but retained copies, and claimed the right to
publish these in vindication of his own conduct.

Two questions were raised, elaborately argued, and
deliberately considered—1st. Whether she had such a
property in the letters as entitled her to forbid their pub-
lication. 2d. Whether her conduct toward the defendant
authorized him to publish the letters; and both were
found in plaintiff's favor. In all the cases referred to, the
sole object of the bill was to *suppress the publication;* but
it does not thence follow, had the object been to obtain
the original manuscript, especially after the receiver's
death, that this would have been disallowed; but the
contrary is plainly to be inferred from the language in
*Woolsy vs. Judd* (4 *Duer*, 387), in which it is said:

"Not only is the right of property in the author not
subject to the limitation which some have supposed to

exist, but it is absolute as well as unlimited.   When he applies for an injunction, it is not necessary that he should aver that he desires to take from the defendants, or secure to himself, the profits of publication.   As owner, he has an absolute right to suppress as well as to publish; and he is as fully entitled to the protection and aid of the court, when suppression is his sole and avowed object, as when he intends to publish."

As the author has both the absolute right of *publication* and *suppression*, and because only the latter right has been asserted in the referred to cases, these by no means determine his right of publication ; and the possession of the original manuscript being essential to this right, it is almost certain that, as against the receiver, on a bill filed for the purpose, the court would compel a surrender of the original ; but as against the representatives, the bailee or donee of the receiver, after his death, I apprehend the author is entitled to the original manuscript of such letters, even without averring a desire to publish, because then the sole and exclusive property is in him.   The most that can be said of the gift to a receiver is, that the sender has given him the right to read and keep the letter during his life, but not to expose it to the gaze, nor give it to others, much less to pass it by absolute fee, on the termination of the life estate, to another.

Therefore, I regard the analogy between the receiver's rights to such letters and the wife's separate rights to her personal jewels, as about the same as between her dower right and the inheritance in fee of real estate.

And I regard this doctrine as quite as disastrous to wives as husbands; for if the wife has the right, " *regardless of his will*," to dispose of his letters to her, so must the husband have the right, regardless of the wife's will, to dispose of her letters to him, and thus the *confidence*,

*delicacy*, *privacy*, and, I may add, sacredness of the connubial relations, may be at the absolute disposal of either party.

If Mrs. Breckinridge could pass the absolute right of possession to Mrs. Grigsby of those letters written to her by her surviving husband, why may not Mrs. Grigsby pass it to some one else, and her vendee or bailee to another, and so on *ad infinitum;* and if this is to be the recognized law of the land, to what purpose need the right of injunction against publication be further cared for; for what will be its practical purposes and uses?

Then, in the name of every husband and wife of the Commonwealth, and as I regard the sacred, secret privacy of the family relation, and its security against the prying eye of the curious, I dissent from the recognition of any legal rule which will expose these sacred relations and private affairs to the gaze of the world or outside community through the agency of either husband or wife.

The liberty claimed for the wife in this instance strikes from wives in general that sacred shield which the analogies of the law throw around their freedom, and which will prove their surest protection, independence, and liberty.

This delivery by the receiver to any one else is a publication in the legal sense, and a violation of the writer's legal rights; and to recognize the vendee's legal right to hold the letters as against the author, and yet to grant an injunction, would seem to be unphilosophic; but especially is this the case when there is no averment in the petition that Grigsby or wife intends to publish them, and when they, in their answer, expressly disavow such an intention.

The petition goes for a surrender of the original letters and a temporary injunction against publication pending the litigation; and as no intent of publishing is averred or proven, no cause of action is made out unless the plaintiff has a right to the custody of at least the letters written by him; and the judgment should be reversed, with a direction to dismiss the petition without prejudice.

But I think the judgment should be affirmed, so far as it requires the surrender of the letters written by plaintiff, but reversed as to the letters written by others; for, as to these, I think, after Mrs. Breckinridge's death, her entire property ceased in them, and they belonged to their authors, and with which the plaintiff, neither in his own right nor as her representative, had any right of custody; and as to these, I understand him to abandon all claim.

There may be much plausibility in saying, that, from the very nature of this property, the receiver's rights are essentially separate and exclusive of that of her husband, so far as letters by others may be written to her; but how she can have a separate exclusive property in those written to her by the husband is beyond my comprehension, especially if he, as author, is to be deemed as having any property whatever in them, and thus be a joint owner with her. As the wife gets no legal, separate, exclusive estate by the mere act of the husband's sending letters to her, her possession of such must be regarded as his legal possession; and when the wife attempts by her own act, without his consent, to deprive him of this legal custody and right of property in the letters, it would seem to present a strong case for the interposition of a court of justice to restore to him his legal rights of possession and property.