Hoyt *v.* Mackenzie.

## Hoyt *vs.* Mackenzie and others.

At common law, the author of a book, or other literary production, whether in the shape of letters or otherwise, has a right of property therein, until it has been published with his assent; and he may maintain an action for his damages arising from a surreptitious publication thereof.

And a court of equity will, by injunction, restrain the publication of letters written by the complainant, if they are of any value to him as literary productions; or if his right to multiply copies thereof is of any value to him.

*Aliter,* however, in relation to letters written to the complainant by other persons, without any authority, express or implied, being given to him to publish them.

A letter cannot be considered of value to the author, for the purpose of publication, which he would not willingly consent to have published.

A court of equity cannot properly exercise the power to restrain the publication of private letters, on the ground of protecting literary property, where they possess no attribute of literary composition.

A court of equity has no jurisdiction to restrain or punish crime, or to enforce the performance of a moral duty, except so far as the same is connected with the rights of property.

Although it may be evident that the publication of private letters is with the view of wounding the feelings of individuals, or of gratifying a perverted public taste, a court of equity has no jurisdiction to restrain their publication, when they are of no value as literary property.

*Wetmore* v. *Scovel,* (3 *Edw. Ch. Rep.* 515,) approved of.

Hoyt v. Mackenzie.

THIS was an appeal from an order of the vice chancellor of the first circuit, denying the application of W. Taylor, one of the defendants in this cause, to dissolve an injunction. The bill stated, among other things, that the complainant, in May, 1844, was in possession of, as his own property, certain letters composed by him and addressed to other persons named in the bill, copies of which letters were contained in a printed pamphlet annexed to the bill as a schedule; that at the same time he was in possession of other letters addressed to him in the way of private correspondence, by certain individuals named, and by other persons, copies of portions of which letters were also contained in the printed pamphlet; which last mentioned letters were the compositions of the several persons by whom they purported to have been written; that the writers of the letters, respectively, had the sole and exclusive right of making and multiplying copies thereof, and of printing and publishing the same; that the complainant had the right to the possession of such letters and their contents, and had a special property therein as the bailee of the writers thereof respectively; that the defendants W. L. Mackenzie and C. S. Bogardus, or one of them, surreptitiously and fraudulently obtained possession of such letters, by breaking open a chest in the custom house in which the complainant had deposited them for safe keeping, under lock and key, as the complainant believed and charged; that having so possessed themselves of the letters, they used them for the purpose of making up the pamphlet annexed to the bill in this suit, and procured the pamphlet to be stereotyped, printed and published, and numerous copies thereof to be sold; and that they and the other defendants, some of whom were their associates and others were their agents, had other printed copies on hand for sale, and that they intended to print and publish copies thereof to an indefinite extent, and to sell the same; that the defendants also intended to print and publish and offer for sale others of the letters so purloined or surreptitiously obtained; that some of the defendants, and particularly W. Taylor, the appellant, a vendor of books in New-York, had sold several copies of the pamphlet, as the agent of, and on commission for, Mackenzie, and others of the defen-

dants, as the publishers, and had received and still held large sums of money as the proceeds of such sales. The complainant also alleged, in his bill, that the letters surreptitiously obtained from him and printed in the pamphlet constituted its chief value, and that the several portions of the pamphlet exclusive of the letters had no literary or other value than as connecting the letters together. And he insisted that the publication of the letters composed and written by him, was in violation of his right of property therein as author, and of his exclusive right to print and publish the same and to make and multiply copies thereof; and that the publication of the letters addressed to and received by him, was in violation of the right of property of the writers of such letters, as the authors, who had the exclusive right to make and multiply copies thereof; and was also a violation of his special property in such letters as the bailee of the writers and authors; and that he was entitled to the aid of the court to restrain the further publication of all the letters contained in the pamphlet, and the publication of those not contained therein, and to call for an account of the profits and proceeds of the publication and sale already made. The prayer of the bill was therefore framed accordingly.

Upon the filing of the bill an ex parte injunction was obtained, restraining the defendants, and their agents, from printing or publishing, or in any manner disseminating, or parting with, the original letters, or copies thereof, or printing, publishing, selling, or offering for sale, or disposing of, the pamphlet, or the stereotype plates of the same, or parting with or paying over any part of the proceeds of the sale of the pamphlet, other than to the complainant

*M. G. Harrington*, for the appellant.

*W. M. Evarts*, for the respondent.

THE CHANCELLOR. I have no doubt that by the principles of the common law the author of a book or other literary production, whether in the shape of letters or otherwise, has a right

Hoyt *v.* Mackenzie.

of property therein ; at least until it has been published with his assent. The case of *Webb* v. *Rose*, decided by Sir Peter Jekyll in 1732, where the clerk of a deceased conveyancer was re-strained from printing the decedent's drafts, was based upon that principle. This was followed by the decision of Lord Hardwicke, in the case of *Pope* v. *Curl*, (2 *Atk. Rep.* 342,) in 1741, where the defendant was restrained by injunction from publishing Pope's letters to Dean Swift ; and by the decision in the case of *Forrester* v. *Waller*, a few days previous, where the defendant was restrained from publishing the complainant's notes which had been surreptitiously obtained. Lord Northing-ton also, in the case of *The Duke of Queensbury* v. *Shebbeare*, (2 *Eden's Rep.* 329,) which came before the court of chancery in England in 1758, refused to dissolve an injunction which restrained the printing of an unpublished manuscript history of the reign of Charles the second, by Lord Clarendon ; a copy of which manuscript had been taken by permission of the personal representative of the author, and which the person receiving the same had sold to the defendant for publication, without authority. Indeed it appears to have been conceded by the counsel, as well as by all the judges, in the case of *Millar* v. *Taylor*, (4 *Burr. Rep.* 2303,) that by the common law an author was entitled to the exclusive right to print his own literary productions, until they had been once printed and published by his authority ; and could maintain an action for the damages which he might sustain by their being surreptitiously printed by others. And Mr. Justice Yates only differed in opinion with Lord Mansfield and the other judges of the court of king's bench, in that case, upon the question whether an author did not lose his exclusive right, by printing and publishing his work himself ; except so far as his right to the copy was protected by the statute on that sub-ject. It is true, when the question as to the rights of an author afterwards came before the house of lords, one of the twelve judges of England thought the author had no exclusive right to his unpublished work, at the common law ; and two others thought he could not maintain an action at the common law against any person who printed and published his literary pro

duction without his consent, unless such person obtained the copy by fraud or violence.

The decisions to which I have referred settle the law on the subject in England. And as they were all made before the separation of the colonies from the mother country, I consider them as binding upon this court. I should therefore affirm the decision of the vice chancellor, so far as relates to the three letters written by the complainant himself, if those letters were in fact of any value to him as literary productions, or if his right to multiply copies thereof was worth any thing to him. In relation to the letters written to him by other persons, however, if those letters were of any value to the authors, as literary productions, or for publication, the cases of *Pope* v. *Curl*, before referred to, and of *Thompson* v. *Stanhope*, (*Amb. Rep.* 737,) show that the right belonged to them, and not to the complainant; who received their letters without any authority express or implied to publish them.

It is evident, however, in relation to all of these letters, that the complainant never could have considered them as of any value whatever as literary productions. For a letter cannot be considered of value to the author, for the purpose of publication, which he never would consent to have published; either with or without the privilege of copy right. It would therefore be a perversion of a correct legal principle, to attempt to restrain the publication of these letters, upon the ground that the writers thereof had an interest in them as literary property. No one, it is true, whose moral sense is not depraved, can justify the purloining of private letters, and publishing them for the purpose of wounding the feelings of individuals, or of gratifying a perverted public taste. And it is hardly possible that any one who has been connected with the publication and sale of the pamphlet annexed to the complainant's bill, could for a moment have supposed that these letters were honestly obtained, for publication; or that they were published with the approbation of the writers thereof, or of the complainant to whom most of them were directed. But this court has no jurisdiction to restrain and punish crime, or to enforce the performance of moral duties, except so far as

they are connected with the rights of property. The vice chancellor, in the case of *Wetmore* v. *Scovel,* (3 *Edw. Ch. Rep.* 515,) very correctly decided that the court of chancery could not properly exercise a power to restrain the publication of private letters, on the ground of protecting literary property, where they possessed no attribute of literary composition. And upon that principle the application of the appellant should have been granted in this case. The order appealed from must therefore be reversed; and the injunction so far as it affects the rights of the appellant, must be dissolved.