## SUPREME COURT.

WILSON EYRE and LOUISA his wife agt. EDWARD Y. HIGBEE and FANNY his wife.

*Letters* in regard to matters of business or friendship, although they pass to the executor or administrator, are not *assets* in their hands, and cannot be made the subject of sale or assignment by them. They belong to the widow and next of kin of the testator or intestate.

*New York General Term, October,* 1861.

GOULD, MULLIN and INGRAHAM, *Justices.*

APPEAL from judgment entered for plaintiffs at special term. (*Reported* 15 *How. Pr. R.,* 45.)

E. W. STOUGHTON, *for defendants.*

H. A. CRAM, *for plaintiffs.*

By the court, MULLIN, Justice. The letters which are the subject matter of this litigation, were written by General Washington to Colonel Tobias Lear, his private and military secretary.

The first and important question in this case is, what

property, if any, Colonel Lear acquired or had in these letters at the time of his death.

That letters written by one person to another, whether in regard to matters of business or friendship, (aside from the question whether they have any literary value,) are property, is perfectly well settled. (*Gee* agt. *Pritchard*, 2 *Swans.*, 402 ; 2 *Story's Eq.*, § 945, *et seq.*; *Eden on Inj.*, 2d *Am. ed.*, 324, 325.)

On the death of Colonel Lear these letters would have passed to his administrator, had one been appointed. (*Earl of Granard* agt. *Dunken,* 1 *Rol. & Beat.*, 207 ; *Ex'rs of Lord Chesterfield* agt. *Stanhope*, *Amb.*, 737 ; *Pope* agt. *Curl*, 2 *Atk.*, 342.)

But though letters pass to the personal representative, they are not assets, which may be sold in the course of administration to pay debts.

The property which the receiver of a letter acquires in it is not such a property as the holder must have, in order to make them assets.

In 2d *Williams on Executors*, it is said : " The absolute property of the goods must have been vested in the testator, in order to make them assets in the hands of the executor." Hence it has been held, that property held by the testator or intestate in trust is not assets.

The same author, at page 1,510, says : " If the patron of a church grants to the testator the next avoidance, and the church becomes void, and the testator dies before he presents, and after his death his executor presents, and has the benefit of preferring his son or his friend, yet this shall make no assets in his hands, because he could not lawfully take money to present."

Totten, in his *Law of Executors and Administrators*, 118, says : " But to give the executor title or to constitute assets, the absolute property of such chattels must have been vested in the testator ; therefore, if A take a bond in trust for B, and die, it shall form no part of the assets of

A.   So if the obligee assign a bond, and covenant not to revoke the assignment, the bond shall not be included amongst his assets.   Nor shall goods bailed or delivered for particular purposes—as to a courier to convey to London, or to an innkeeper to receive in his inn—be assets in the hands of their respective administrators.   Nor shall goods pledged or pawned in the hands of the executor of the pawnee, nor goods distrained for rent, or other lawful cause, be considered as the assets of the party distraining. Nor if the testator were outlawed at the time of his death, shall his effects be so considered."

It was held in *Pope* agt. *Curl*, (2 *Atk.*, 342,) that the writer of letters, addressed and sent to another, does not part wholly with his property in the literary compositions, nor give the receiver the power of publishing them; that at most the receiver has only a special property in them, and possibly may have the property of the paper.   But this does not give a license to any person whatsoever to publish them; and at most the receiver has only a joint property with the writer.

Lord Eldon, in *Gee* agt. *Pritchard*, (2 *Swanst.*, 402,) speaking of the property which the receiver of a letter has in it, says :   "The property is qualified in some respects, that by sending the letter the writer has given, for the purpose of reading it, and, in some cases, of keeping it, a property to the person to whom it is addressed ; yet that the gift is so restrained that beyond the purposes for which the letter is sent, the property is in the sender.   Under such circumstances it is immaterial whether the intended publication is for the purpose of profit or not.   If profit, then the party is selling, if not for profit, he is then giving that, a portion of which belongs to the writer."

Although the Lord Chancellor was speaking in the case cited, of letters which were of some literary value, yet the English court of chancery had extended its protection by means of injunction over letters on matters of business or

friendship, and for the reason that the writer had an interest therein, and it would not permit a breach of his confidence by allowing their publication.

Chancellor WALWORTH, in *Hoyt* agt. *Mackenzie*, (3 *Barb. Ch. R.*, 320,) follows the English court of chancery in protecting letters as literary property, but refuses to restrain the publication of letters that have no literary value. Whether the chancellor was right in refusing to enjoin the publication of such letters is not now important to inquire. But I do not understand him as holding or intimating that the receiver of such letters has any higher or greater rights of property in them than in those which are of literary value.

At all events, the property of the receiver of a letter is not absolute—the writer has for some purposes an interest in it, and such a property is not assets in the hands of the executor or administrator.

I cannot find that in any instance in this country or in England has it ever been attempted to make letters received by a person in his lifetime assets on his death, and become the subject of sale to pay debts and legacies. If such a right has existed, all classes and descriptions of men have, until now, elected to waive it, and have left the sanctity of private confidence uninvaded, and the letters of affection and friendship to remain in the custody of those relatives and friends who were best calculated to guard them, and most likely to respect them.

But this universal acquiescence evidences something more than a mere waiver of a right through respect for either the living or the dead; it demonstrates that no such right has ever existed; that such property is not the subject of sale, but like the remains of the dead are sacred from the rapacity of creditors or the avarice or malice of surviving friends or enemies.

It would be a disgrace to the age in which we live and to the government whose laws we administer, if the letters

from a testator's or intestate's wife or child could be made the subject of sale at auction, and the peace of families, the character of individuals, the secrets of governments, published to the world, in order that a few pence might be realized in order to pay a debt or legacy. Such things I trust cannot be done. In no imaginable contingency can I be induced to give my sanction to such monstrous doctrines.

At common law the property in the coffin, shroud and other apparel of the dead was in the executor. (*Totten's Ex'rs*, 118.) But were these things therefore assets, and the subject of sale ? And yet I do not perceive why it would not be as high an evidence of civilization and refinement to sell them as the letters which the dead man had received from those who loved and trusted him, and which may have been to him as dear as the apple of his eye.

It seems to me, therefore, that letters, notwithstanding they pass to the executor or administrator, are not assets in his hands, and cannot be made the subject of sale by him.

Col. Lear left heirs surviving, his widow, and Benjamin Lincoln Lear, his only son and heir at law. These letters were at the time of Col. Lear's death in his house, and thereafter during the life of his widow in her possession. The son and widow lived together in the same house till her death in 1856. The widow, then, had the custody of the letters for a period of forty years, with the knowledge of the son, as it clearly appears. Other letters from Gen. Washington to Col. Lear were in the custody of the son, and by the evidence of Mr. Rush it would seem that the son recognized the possession of his mother as lawful and right as between them. It would seem also that Mrs. Lear exercised acts of ownership over these letters, giving some to Mr. Rush, and through him one to President Polk, and making at one time arrangements to transfer all that remained to the state of Virginia.

In 1857 letters of administration were taken out in the

city of New York, by Wilson Eyre, one of the plaintiffs, who afterwards sold the letters in question to one Hays, without consideration, who, without consideration, transferred them to Mrs. Eyre, the other plaintiff.

The residuary legatee of Benjamin L. Lear has also conveyed to Mrs. Eyre whatever interest she may have had in the letters in question.

The referee finds the defendant Mrs. Higbee took the papers into her custody during the last illness of Mrs. Lear, and has had their custody ever since, and no other title or right to the letters is shown by the defendants.

As already suggested, it is doubtless true that the letters would have passed, on the granting administration, to the person appointed administrator, and that he might have maintained an action for the recovery thereof. But during the forty years that Colonel Lear was without a representative, the letters were in the actual custody of the widow, with whom the son and heir of the intestate lived.

It is not shown what share of the estate of an intestate passed on distribution to his widow, by the laws of the District of Columbia. We must presume, therefore, that the common law which was in force in this country at the time of our separation from Great Britain, was in force there, at the time of the death of Colonel Lear.

By the law of England the widow was entitled to one-third part of the personal estate after the payment of debts, and the next of kin to the residue. The widow and Benjamin L. Lear, then, were the parties *solely* entitled to the personal estate of Colonel Lear, and they owned it as tenants in common, subject to the payment of debts. ( *Wooden* agt. *Bagley*, 453, 456.) But as widow and next of kin they could maintain no suit for its recovery. But being in the actual possession they could defend their interest in it against all the world, except the administrator.

In this case the administrator has asserted his title, sold the property, and the purchaser brings this suit.

If I am right in supposing that the letters are not assets, then the administrator could not sell. He could only acquire the possession for the purpose of transferring them to the widow or next of kin. While at law he might maintain an action against the latter for the recovery of the possession, would a court of equity permit the administrator to come into that court and recover the possession from the widow or next of kin, when immediately upon its delivery to him they would be entitled to demand it back? The plaintiffs cannot claim that their title to these letters shall be protected, as *bona fide* purchasers from the administrator.

If the letters were not assets, the administrator had no power of sale, and the purchaser from him knew it, or is presumed to have known it. But if they did not know they were not assets, neither the first purchaser nor the plaintiffs have paid value, and thus the very foundation of their title fails.

If I am right in supposing that the widow and next of kin could lawfully hold possession of the letters as against all the world, except the administrator, and as against him in equity, as the letters are not assets, the question recurs whether any exclusive right is shown in Mrs. Lear, from whom defendant Mrs. Higbee obtained the possession.

It seems to me the evidence of Mr. Rush shows Mrs. Lear in the exclusive possession and exercising acts of ownership over the letters for many years with the knowledge and assent of Benjamin L. Lear, as against him and his personal representatives. We must, after so great a lapse of time, presume a grant of the letters from him to her.

In 1st *C. and H.,* (*Notes to Phillips' Ev.,* 302,) it is said long acquiescence by one in the adverse enjoyment of a right by another, leads to an inference that the former has parted with it in a legal form, and in time may lead to the presumption of the necessary instruments of assurance, or of the requisites to make existing assurances valid against him.

It is alleged in the complaint that the defendant Mrs. Higbee acquired the possession of the letters, not only without the knowledge or assent of Mrs. Lear, but against her will. These allegations are denied by the answer, and the plaintiffs have introduced a servant, who resides in their family, to establish the truth of the averment.

The referee, very properly I think, has neglected to find the allegations proved, but he does find that during Mrs. Lear's last illness, Mrs. Higbee took the letters into her custody, and the defendants have ever since detained them. The referee further finds that defendants did not prove any title or right of possession, or both or either of them, as to said papers.

This finding does not show the possession of the defendants unlawful, or that the acquisition of their possession was wrongful. The referee merely found that the defendants were in the actual possession of the letters, and that they were obtained from the possession of Mrs. Lear. As against every person but Mrs. Lear's personal representatives, this possession of the defendants is lawful, and will enable them to assert their interest in the property against every person not clothed with the rights of Mrs. Lear :

My conclusions, then, are :

1. That the letters in question were not assets in the hands of the administrator of Col. Lear.

2. Not being assets, they could not be sold, but belonged to the widow and next of kin.

3. That the widow in her lifetime acquired the interest that Benjamin L. Lear had in the letters, and became thus the legal owner of them.

4. That the plaintiffs acquired no title to the letters by their purchase ; first, because the administrator had not authority to sell them, and, second, because they were not bona fide purchasers for value paid.

5. That the defendants being lawfully in possession of

the property, have the right to retain that possession as against all the world, except the legal representatives of Mrs. Lear, and they are not parties.

In my opinion, therefore, the plaintiffs cannot maintain this action, and the judgment should be reversed.

GOULD, J. For the purpose of deciding this case, it is not necessary to pass on the question whether the letters which are the subject of the controversy are, or are not, property—at least in the view I take of the case.

The first difficulty in the plaintiffs' case seems to me that it appears from undisputed proof that an administrator has, without consideration, and for the sole purpose of putting title (to what he calls property) out of the estate he is to administer, assigned the letters to a stranger; who, thereupon, and without consideration, reassigns them to the wife of the administrator ; and then this administrator, not in his representative capacity, but as an individual, joins his wife in the suit to recover the letters. It is a fraud on the estate ; and the law cannot sanction it, by allowing a representative so to avoid his trust, and assign property for his own benefit. If the letters are property at all, the title remains in the administrator, and these plaintiffs cannot recover.

Again, granting the claim that the letters are property, it would be unheard of that forty years' possession and control, as owner (plainly so, by all the testimony,) did not constitute a bar, under the statute of limitations, in favor of Mrs. Lear and her estate.

But the proofs are so abundantly strong, as to the whole course—acts and declarations—of Benjamin Lear in regard to these letters, that there can be no doubt that, as between him (and his estate) and Mrs. Frances Lear, these letters were by their joint understanding and agreement hers—hers by such an agreement as, accompanied by actual and continued possession, would of itself make full title to them.

Then, if they are to be treated as part of any one's estate, they are part of her estate; and, in the absence of any disposition by her, either during life or by will, they would go to *her* next of kin. And Mrs. Higbee is one of those; while the plaintiffs not only claim by a different and adverse title, but are strangers in blood to Mrs. Lear.

The plaintiffs' claim seems to me utterly without foundation.

Upon the question of any property in these letters : The right of publication, as one of literary property, would for a reasonable length of time (to allow its assertion by publication) remain in the writer and his personal representatives. After such a period had elapsed that there ceased to be a probability that this right to publish was treated as a legal right, any one might publish who could procure copies. Before publication, however, and after it, and during all the time, the right to the papers themselves—as separate from publishing—would remain in the person to whom the letters were addressed. Whether that right could be treated as so far having value, as to constitute property in the letters, and render them assets in the hand of an executor or administrator, is a very different question. And as it is one which, if settled at all, must be so settled as to be applicable to all classes and kinds of correspondence, of every individual in society, including the most confidential communications as well as the most trivial, it seems to me very dangerous to hold a rule, by which rude hands and strange eyes might invade every secret of domestic life, and destroy the happiness of half the families of the land. It is far safer to leave such matters to be, as they have been, controlled by family considerations and family arrangements. The few cases where (as here) even the lapse of sixty years gives a pecuniary value to the papers, do not offer a reason of force sufficient to risk all the other evils of a different rule. They should not be called property, in the eye of the law.

INGRAHAM, J. I do not think that it is necessary for the decision of this case, that we should express any opinion upon the question whether the receiver of letters has any property in them which would pass to his executor, but I do not wish, by a mere concurrence in the decision of this case, to assent to the proposition that any such property vests in the executor which he could assign or which would be in his hands assets belonging to the estate. Whatever property there is in the letters vests in the writer and not in the receiver.

He may have a right to retain them when he obtains the possession, in the same way as he would a receipt or account to aid him in the settlement of the estate, if they contain anything bearing upon that subject. But further than that, he has no property in them to sell or assign, and they can in no way be used as assets belonging to the estate.

If such letters were of such a character as in the opinion of the executor would be productive of injury (if published) to the writer or others, he may destroy them. If he does so, no one could call him to account therefor ; and when as the holder of them he, as executor, assigns his property in them to another, he gives no title and confers no right which would vest in the assignee a right of action therefor.

In other matters treated of in the opinions of my brethren, I fully concur, as well as in the conclusions adopted by them.