---

RICE *v.* WILLIAMS.

*(Circuit Court, E. D. Wisconsin. August 5, 1887.)*

1. PROPERTY—LETTERS—SALE.
   An advertising solicitor entered into a contract with a "specialist," to furnish him with 60,000 letters which were in the possession of the Voltaic Belt Company. of Marshall, Michigan, that had been written to that company in response to its advertisements of the curative qualities of the instruments and articles in which it dealt. The solicitor paid $500 to the company for such letters, and delivered them to the specialist, who agreed to pay him therefor $1,200, and did pay him $500, but refused to pay him the balance. claiming that the letters had already been used by other specialists, and were valueless. The solicitor sued to recover the balance. *Held*, that the receiver of private letters has not such an interest therein that they can be made the subject of a sale without the writer's consent, and that the contract in this case was void.

2. CONTRACT—VALIDITY—PUBLIC POLICY.
   A contract by an advertising solicitor to sell to a "specialist" letters written by persons afflicted with diseases, to another person who advertised articles and instruments that it was claimed would cure them, in order that such specialist might send his advertisements to them, is contrary to good morals, and void.

*G. W. Hazelton*, for plaintiff.
*Markham & Noyes*, for defendant.

DYER, J. At the conclusion of the plaintiff's testimony on the trial of this case, the court directed a verdict, which, in effect, was a dismissal of the suit. The plaintiff has moved for a new trial. The facts developed by the testimony were, in brief, these: The plaintiff testified that he was an "advertising solicitor," and that among other advertisements solicited by him were such as specialists furnished for the cure of so-called "private diseases." In 1885 he opened correspondence with the defendant, who was a "specialist," practicing his calling at Milwaukee, for the sale to him, for a pecuniary consideration, of 60,000 letters which were in the possession of the Voltaic Belt Company, of Marshall, Michigan. That company was engaged in furnishing electric belts, suspensories, and other electric appliances for the cure of various ailments and disorders. The letters in question were such as it had received from persons residing in different parts of the country, in response to advertisements of the curative qualities of the instruments and articles in which that company dealt. After considerable correspondence on the subject, the plaintiff agreed to furnish to the defendant the letters in question, and the defendant agreed to pay therefor, or for the use thereof in connection with his business, the sum of $1,200. The letters were shipped to the defendant, and received by him, and he paid to the plaintiff $500 on the purchase. The plaintiff testified that he paid the Voltaic Belt Company $500 for the letters, and, as a part of the transaction, was to furnish to that company other letters procured from "specialists." The defendant's purpose in procuring the letters in question was to obtain the names and post-office addresses of the writers, so that he might send to them circulars advertising *his* remedies for the various diseases which he professed to cure. It was claimed in argument that it was not, and could not have been, one of the objects of the parties engaged in this business, to enable the defendant to learn from the letters the nature of the maladies with which the writers were afflicted, because a perusal of the contents of the letters would be in the last degree dishonorable, and, of course, the parties contemplated only an honorable transaction! The court is, however, of the opinion that parties who would engage in such a traffic as this, would hardly refrain, on a point of honor, from a perusal of the letters, not only to obtain the names and post-office addresses of the writers, but also all the disclosures which the writers might make concerning the physical infirmities from which they were suffering. The court has no doubt that this was one of the objects sought in the sale and purchase of the use of these letters, because, obviously, it was quite as important to the defendant to know whether the writers of the letters stood in need of such restoratives to health as he could supply, as to know their names and post-office addresses.

The defendant refused to pay the balance of $700 yet due to the plaintiff on the sale, and this suit was brought to recover from the defendant

that sum. The defendant resisted payment, on the ground that the plaintiff represented to him, in making the sale, that the letters had never before been used, or, in the technical language of the profession "circularized;" that this representation was false, and that the letters were valueless. · Enough was disclosed in the testimony to show that the sale of the use of the letters in the manner described, is a branch of "industry" extensively pursued by certain "specialists" throughout the country. But it would seem that, in cases where the writers are made the repeated victims of advertising circulars, their better sense at last gets the advantage of their credulity, and they refuse longer to be baited by the remedies which might otherwise tempt them, and so their letters become valueless as articles of merchandise, or for further use. Thus it was, according to the theory of the defense, in the case at bar. The trial, however, did not proceed far enough to fully develop the facts in this regard.

To fitly characterize the contract in suit is to unreservedly condemn it as utterly unworthy of judicial countenance. It was *contra bonos mores*, and it would seem that, on grounds of public policy, the court might well refuse either to aid the plaintiff in enforcing it, or the defendant in recovering damages for the breach of it. Thus to traffic in the letters of third parties, without their knowledge or consent, and to make them articles of merchandise in the manner attempted here, was, to mildly characterize it, grossly disreputable business. It was said on the argument that the letters were not in evidence, and that the court could assume nothing with reference to their contents. But enough was indicated in the correspondence of the parties which preceded the making of the contract, which correspondence was in evidence, to point to the conclusion that the letters which were the subject of bargain and sale, were written by persons who sought medical aid for disorders with which they were afflicted. Counsel for defendant had in court a large number of the letters, and his statements were not controverted that they related to infirmities and maladies of which the writers sought to be cured. The very nature of the contract in suit presupposes such to have been the fact. Ought courts of justice to lend their sanction to such a traffic? Suppose a physician—trusted and confided in as such in the community —were so far to forget or abuse the obligations of his profession, as to make the confidential communications of his patients the subject of bargain and sale; would any court listen for a moment to his complaint of non-performance of the contract, and aid him to recover the purchase price? Presumptively, the letters here in question, were confidential,— at least they were personal as between the writers and the receiver; and though it be true, as was said in argument, that authority is wanting directly applicable to the question here presented, I would not hesitate, on grounds of morality, and upon considerations of common justice, to make an example of this case, by putting upon it the stamp of judicial reprobation.

But there is another ground upon which, applying to the case a principle sanctioned by high authority, the court may, it seems to me, well

refuse to lend its aid to give legal effect to this transaction. The writers of these letters retained such a proprietary interest in them that they could not properly be made the subject of sale without their consent. The receiver of the letters had only a qualified property in them, and legal authority to sell them for a pecuniary consideration could only be maintained upon the theory of an absolute property right. Such a right did not exist.

At an early day in the history of equity jurisprudence, the question arose as to the right of the receiver of letters to cause them to be published without the consent of the writer, and as to the power of a court of equity to restrain such publication. It would be ill-timed and superfluous to review in detail all the cases on the subject, since they have been so thoroughly reviewed and discussed by Justice STORY in the case of *Folsom* v. *Marsh,* 2 Story, 100, and by Judge DUER, in the case of *Woolsey* v. *Judd,* 4 Duer, 379.

The leading cases in England on the subject are *Pope* v. *Curl,* 2 Atk. 342; *Thompson* v. *Stanhope,* 2 Amb. 737; *Perceval* v. *Phipps,* 2 Ves. & B. 19; and *Gee* v. *Pritchard,* 2 Swanst. 402.

In the first-mentioned case, Pope had obtained an injunction restraining the defendant, a London bookseller, from vending a book entitled "Letters from Swift, Pope, and others," and a motion was made to dissolve it. Some unknown person had possessed himself of a large number of private and familiar letters which had passed between Pope and his friends, Swift, Gay, and others, and they had been secretly printed in the form of a book which the defendant had advertised for sale. The case was argued before Lord HARDWICKE, and he continued the injunction as to the letters written by Pope. It was objected that the sending of letters is in the nature of a gift to the receiver, and therefore that the writer retains no property in them. But Lord HARDWICKE said:

"I am of opinion that it is only a special property in the receiver. Possibly the property in the paper may belong to him, but this does not give license to any person whatsoever to publish them [the letters] to the world; for, at most, the receiver has only a joint property with the writer."

*Thompson* v. *Stanhope* was the case of the celebrated Chesterfield letters, in which Lord BATHURST continued an injunction which had been previously granted, restraining the publication of the letters, on a bill filed by the executors of Lord Chesterfield to enjoin the publication.

In *Perceval* v. *Phipps,* a bill was filed praying an injunction to restrain the publication of certain private letters which had been sent by Lady Percival to the defendant Phipps. Lord ELDON granted an injunction, but the vice-chancellor, Sir THOMAS PLUMER, dissolved it, and laid down the doctrine that it is only when letters "are stamped with the character of literary compositions," that their publication can be enjoined. And he sought to bring the decisions in *Pope* v. *Curl* and *Thompson* v. *Stanhope,* within the scope of that doctrine, thereby making them inapplicable to the case before him.

Then came *Gee* v. *Pritchard,* which was a case presented to Lord ELDON, on a motion to dissolve an injunction which he had previously

granted, forbidding the publication by the defendant of a number of private and confidential letters, which had been written to him by the plaintiff in the course of a long and friendly correspondence. The motion to dissolve the injunction was denied.

Following the authority of *Perceval* v. *Phipps*, maintaining that the cases of *Pope* v. *Curl*, *Thompson* v. *Stanhope*, and *Gee* v. *Pritchard* involved only the principle of literary property, Vice Chancellor McCoun in *Wetmore* v. *Scovell*, 3 Edw. Ch. 543, held that the publication of private letters would not be restrained, except on the ground of copyright, or that they possessed the attributes of literary composition, or on the ground of a property in the paper on which they were written. This view of the question received the sanction of Chancellor WALWORTH, in *Hoyt* v. *Mackenzie*, 3 Barb. Ch. 320; but these two cases stand in antagonism to the views expressed by Story in his work on Equity Jurisprudence, (volume 2, §§ 944–948,) and to the judgment of the same learned jurist in *Folsom* v. *Marsh*, *supra*. The opinion of Judge DUER in *Woolsey* v. *Judd*, *supra*, is an exhaustive and able review of the subject, and analysis of the cases; and he very satisfactorily shows that the decisions in *Pope* v. *Curl*, *Thompson* v. *Stanhope*, and *Gee* v. *Pritchard* proceeded upon the principle of a right of property retained by the writer in the letters written and sent by him to his correspondent, without regard to literary attributes or character. The case was one involving the right of the receiver of a private letter to publish it; and it is there clearly shown that the proposition settled as law by Lord ELDON in *Gee* v. *Pritchard*, was that "the writer of letters, though written without any purpose of publication or profit, or any idea of literary property, possessed such a right of property in them that they can never be published without his consent, unless the purposes of justice, civil or criminal, require the publication." Commenting on *Pope* v. *Curl*, the learned judge made the very just observation, that not only was there no intimation in the judgment of Lord HARDWICKE "that there is any distinction between different kinds or classes of letters, limiting the protection of the court to a particular class, but the distinctions that were attempted to be made, and which seem to be all the subject admits, were expressly rejected as groundless." Again, in discussing the effect of the decision in *Gee* v. *Pritchard*, Judge DUER observed:

"Two questions were raised and fully argued by the most eminent counsel then at the chancery bar: *First*, whether the plaintiff had such a property in the letters as entitled her to forbid their publication,—it being fully admitted that they had no value whatever as literary compositions, and that she never meant to publish them; and, *second*, whether her conduct towards the defendant had been such as had given him a right to publish the letters in his own justification or defense. These questions were properly argued as entirely distinct, and each was explicitly determined by the lord chancellor in favor of the plaintiff. The motion to dissolve the injunction was accordingly denied, with costs. It has been said that it was through considerable doubts that Lord ELDON struggled to this decision; but the doubts which he expressed related solely to the question whether it ought originally to have been held that the writer of letters has any property in them after their trans-

mission. He had no doubts whatever that such was the established law, and that he was bound to follow the decisions of his predecessors. He expressly says that he would not attempt to unsettle doctrines which had prevailed in his court for more than 40 years, and could not, therefore, depart from the opinion which Lord HARDWICKE and Lord APSLEY had pronounced in cases (*Pope* v. *Curl, Thompson* v. *Stanhope,*) which he was unable to distinguish from that which was before him. Subsequently, in support of his opinion that the plaintiff had a sufficient property in the original letters to authorize an injunction, he refers to the language of Lord HARDWICKE (quoting the exact words in *Pope* v. *Curl*) as proving the doctrine that the receiver of letters, although he has a joint property with the writer, *is not at liberty to* publish them without the consent of the writer; which is equivalent to saying that the latter retains an exclusive right to control publication. He then adverts to the decision in *Thompson* v. *Stanhope,* as following the same doctrine, and declares that he could not abandon a jurisdiction which his predecessors had exercised, by refusing to forbid a publication in a case to which the principle they had laid down directly applied. He then says: 'Such is my opinion, and it is not shaken by the case of *Perceval* v. *Phipps;*' and significantly adds: 'I think it will be extremely difficult to say where the distinction is to be found between private letters of one nature and private letters of another nature.' "

Such, also, was the view of Story; for he says, (sections 947, 948, Eq. Jur.,) speaking of private letters on business, or on family concerns, or on matters of personal friendship:

"It would be a sad reproach to English and American jurisprudence, if courts of equity could not interpose in such cases, and if the rights of property of the writers should be deemed to exist only when the letters were literary compositions. · If the mere sending of letters to third persons is not to be deemed, in cases of literary composition, an utter abandonment of the right of property therein by the sender, *a fortiori,* the act of sending them cannot be presumed to be an abandonment thereof, in cases where the very nature of the letters imports, as matter of business, or friendship, or advice, or family or personal confidence, the implied or necessary intention and duty of privacy and secrecy. Fortunately for public, as well as for private peace and morals, the learned doubts on this subject have been overruled, and it is now held that there is no distinction between private letters of one nature and private letters of another;" citing *Gee* v. *Pritchard.*

In *Folsom* v. *Marsh, supra,* a case decided in the circuit court of the United States for the First circuit, Justice STORY held that an author of letters or papers of whatever kind, whether they be letters of business or private letters, or literary compositions, has a property therein, unless he has unequivocally dedicated them to the public, or to some private person; and no person has any right to publish them without his consent, unless such publication be required to establish a personal right or claim, or to vindicate character. "The general property," he says, " and general rights incident to property, belong to the writer, whether the letters are literary compositions, or familiar letters, or details of facts, or letters of business. The general property in the correspondence remains in the writer and his representatives; * * * *a fortiori,* third persons, standing in no privity with either party, are not entitled to publish them, to subserve their own private purposes of interest, or curiosity, or passion. If the case of *Percival* v. *Phipps,* 2 Ves. & B. 21–28, before the then vice-

chancellor, (Sir THOMAS PLUMER,) contains a different doctrine, all I can say is that I do not accede to its authority; and I fall back upon the more intelligible and reasonable doctrine of Lord HARDWICKE in *Pope* v. *Curl*, 2 Atk. 342, and Lord APSLEY in the case of *Thompson* v. *Stanhope*, 2 Amb. 737, and of Lord Keeper HENLEY EDEN in the case of *Duke of Queensberry* v. *Shebbeare*, 2 Eden, 329, which Lord ELDON has not scrupled to hold to be binding authorities upon the point in *Gee* v. *Pritchard*, 2 Swanst. 403."

If this be the law, where the right of publication is in question, assuredly it is not less so in a case where third persons, having obtained possession of private letters, are seeking to make them the subject of sale and purchase, without the consent of the writers. Nor do I think the court should hesitate to apply the principle here, although the writers are not themselves interposing for equitable relief, since, if the property right is yet retained by the writers, no lawful sale of the letters can be made. In *Eyre* v. *Higbee*, 22 How. Pr. 198,—decided by Judges GOULD, MULLIN, and INGRAHAM, all concurring,—it was adjudged that letters in regard to matters of business or friendship, although they pass to an executor or administrator, are not assets in their hands, and cannot be made the subject of sale or assignment by them. This judgment of the court was made expressly to rest upon the principle that "the property which the receiver of letters acquires in them is not such a property as the holder must have in order to make them assets."

Motion for a new trial overruled.