HENRY M. BAKER, executor, *vs.* CHARLES F. LIBBIE & another.

Suffolk.    November 24, 1911. — January 4, 1912.

Present: RUGG, C. J., HAMMOND, BRALEY, SHELDON, & DECOURCY, JJ.

*Equity Jurisdiction,* To restrain publication of private letters.    *Letters.*

Review by RUGG, C. J., of the authorities relating to the protection by courts of equity of the right of the author of an ordinary private letter, which is without value as literature, to restrain its publication.

The executor of the will of the author of friendly letters, which do not possess the qualities of literature and were written to a cousin about domestic and business affairs, referring to household matters, to health and to the work that the writer was doing, may maintain a suit in equity, to restrain the publication of such letters or their multiplication in any way in whole or in part, and to compel the holder of the letters to allow the plaintiff to make copies of them within a reasonable time; but he is not entitled to a decree restraining the sale and transfer of such letters as manuscripts.

BILL IN EQUITY, filed in the Superior Court on February 17, 1911, by the executor of the will of Mary Baker G. Eddy, late of Concord in the State of New Hampshire, against the members of a firm engaged in business in Boston as auctioneers of books and manuscripts, alleging that a number of private unpublished letters written by the plaintiff's testatrix had come into the possession of the defendants in the course of their business, that the defendants had advertised such letters for public sale in their auction rooms in Boston and already had printed and published material and substantial parts of the letters in their sale catalogue, that the catalogue was being distributed by the defendants, and would be further distributed to the persons in attendance at such auction and that portions of the letters also had been published in the newspapers of Boston, New York and other cities of the country; and praying that the defendants might be enjoined and restrained " from further printing, pub-

lishing, selling, circulating, or in any manner making public or showing said letters, or any of them, or any copy or copies, extract or extracts therefrom, or any of them, to any person or persons," and "from further circulating or distributing or making public in any manner copies of said catalogue containing extracts from any of said letters."

The case came on to be heard before *Richardson*, J., who by agreement of the parties reserved and reported it, upon the bill and answer, and all questions of law therein, for determination by this court.

*S. J. Elder*, (*E. A. Whitman & W. A. Morse* with him,) for the plaintiff.

*W. M. Prest & F. B. Livingstone*, for the defendants, submitted a brief.

RUGG, C. J. The plaintiff as executor of the will of Mary Baker G. Eddy, the founder of "Christian Science" so called, seeks to restrain an auctioneer of manuscripts from publishing for advertising purposes and from selling certain autograph letters of his testatrix. These letters were written in her own hand by Mrs. Eddy, as is said, "during one of the most interesting periods of her career, that is, just after the first publication of her 'Science and Health with Key to the Scriptures,'" in 1875. It is averred in the answer that the letters have no attribute of literature, but are merely friendly letters written to a cousin about domestic and business affairs. Extracts from the letters show that they refer to household matters, to health and to the work she was doing. The questions raised relate to the existence, extent and character of the proprietary right of the writer of private letters upon indifferent subjects not possessing the qualities of literature and to the degree of protection to be given in equity to such rights as are found to exist. These points have never been presented before for decision in this Commonwealth. The nearest approach was in *Tompkins* v. *Halleck*, 133 Mass. 32, where the rights of an author of a dramatic composition put upon the stage but not printed were protected against a rival presentation made possible by human memory (overruling upon this point the earlier case of *Keene* v. *Kimball*, 16 Gray, 545) and *Dodge Co.* v. *Construction Information Co.* 183 Mass. 62, where property rights in valuable commercial in-

formation distributed to subscribers in writing, in print, by telegraph or orally, were recognized and protected against use by a rival concern. Neither of these decisions touches at all closely the points involved in the case at bar.

The rights of the authors of letters of a private or business nature have been the subject of judicial determination in courts in England and this country for a period of at least one hundred and seventy years. The first English case was *Pope* v. *Curl,* 2 Atk. 341, which was in 1741. It was a suit by Alexander Pope to restrain the publication of letters written by him to Swift and others. In continuing an injunction Lord Chancellor Hardwicke, after remarking that no distinction could be drawn between letters and books or other learned works, said: "Another objection has been made . . . that where a man writes a letter, it is in the nature of a gift to the receiver. But I am of opinion that it is only a special property in the receiver, possibly the property of the paper may belong to him; but this does not give a license to any person whatsoever to publish them to the world, for at most the receiver has only a joint property with the writer. . . . It has been insisted . . . that this is a sort of work which does not come within the meaning of the act of Parliament [as to copyright], because it contains only letters on familiar subjects, and inquiries after the health of friends, and cannot properly be called a learned work. It is certain that no works have done more service to mankind, than those which have appeared in this shape, upon familiar subjects, and which perhaps were never intended to be published; and it is this makes them so valuable."

*Thompson* v. *Stanhope,* 2 Ambl. 737 (1774) was a suit by the executors of Lord Chesterfield to restrain the publication of his now famous letters to his son, which the widow of the latter proposed to print and sell. Some of these possessed literary merit of a high order. Lord Chancellor Apsley was " very clear " that an injunction should be granted, upon the authority of the foregoing decision and the somewhat kindred cases of *Forrester* v. *Waller,* cited 4 Burr. 2331, and *Webb* v. *Rose,* cited 4 Burr. 2330, where notes and conveyancer's draughts were held to be the literary property of the writer or his representatives, and *Duke of Queensberry* v. *Shebbeare,* 2 Eden, 329, where the publication

of a part of Lord Clarendon's History by a possessor of the manuscript was restrained.

*Gee* v. *Pritchard*, 2 Swanst. 402, 426, was decided by Lord Eldon in 1818. Letters apparently without literary or other special interest by the plaintiff to the son of her husband were the subject of the suit, and publication was restrained on the ground of the property right of the writer. In *Lytton* v. *Devey*, 54 L. J. (N. S.) Ch. 293, 295, it was said : "The property in the letters remains in the person to whom they are sent. The right to retain them remains in the person to whom the letters are sent; but the sender of the letters has still that kind of interest, if not property, in the letters that he has a right to restrain any use being made of the communication which he has made in the letters so sent by him." See also *Prince Albert* v. *Strange*, 2 DeG. & Sm. 652; *S. C.* 1 MacN. & G. 25, 43. This same principle was followed expressly in the Irish case of *Earl of Granard* v. *Dunkin*, 1 Ball & Beatty, 207, and in *Labouchere* v. *Hess*, 77 L. T. (N. S.) Ch. 559. There are several dicta to the same effect by great English judges. For example, Lord Campbell said in *Boosey* v. *Jefferys*, 6 Exch. 580, at 583, " A court of equity will grant an injunction to prevent the publication of a letter by a correspondent against the will of the writer. That is a recognition of property in the writer, although he has parted with the manuscript; since he wrote to enable his correspondent to know his sentiments, not to give them to the world." Lord Cairns said, respecting correspondence in *Hopkinson* v. *Burghley*, L. R. 2 Ch. 447, at 448: " The writer is supposed to intend that the receiver may use it for any lawful purpose, and it has been held that publication is not such a lawful purpose." See also *Jefferys* v. *Boosey*, 4 H. L. Cas. 815, 867, 962. The latest English case on the subject recognizes this as the well settled rule. *Philip* v. *Pennell*, [1907] 2 Ch. 577. In 1804 the Scottish court on the suit of his children interdicted the publication of manuscript letters of Robert Burns. *Cadell & Davies* v. *Stewart*, 1 Bell's Com. 116 n.

The earliest case in this country, *Denis* v. *Leclerc*, 1 Martin, (La.) 297, arose in 1811. A single letter of no literary pretension was there in question and its publication was enjoined, and the writer's property interest in the letter was distinctly upheld.

The question was elaborately discussed by Mr. Justice Story in *Folsom* v. *Marsh*, 2 Story, 100, 110, who held that " The author of any letter or letters, (and his representatives,) whether they are literary compositions, or familiar letters, or letters of business, possess the sole and exclusive copyright therein; and that no persons, neither those to whom they are addressed, nor other persons, have any right or authority, to publish the same upon their own account, or for their own benefit."

In *Bartlett* v. *Crittenden*, 5 McLean, 32, at 42, Mr. Justice McLean said: " Even the publication of private letters by the person to whom they were addressed, may be enjoined. This is done upon the ground that the writer has a right of property in his letters, and that they can only be used by the receiver for the purpose for which they were written. "

In *Woolsey* v. *Judd*, 4 Duer, 379, the question was considered exhaustively, and all the earlier cases were reviewed. The conclusion was reached that the writer of even private letters of no literary value has such a proprietary interest as required a court of equity at his instance to prohibit their publication by the receiver.

*Grigsby* v. *Breckinridge*, 2 Bush, 480, decided that " the recipient of a private letter, sent without any reservation, express or implied " held " the general property, qualified only by the incidental right in the author to publish and prevent publication by the recipient, or any other person."

In *Barrett* v. *Fish*, 72 Vt. 18, at 20, it was said " that a court of equity will protect the right of property in such [private] letters, by enjoining their unauthorized publication." The same doctrine has been held, either expressly or by way of dictum, in *Dock* v. *Dock*, 180 Penn. St. 14, 22 ; *Rice* v. Williams, 32 Fed. Rep. 437 ; *Eyre* v. *Higbee*, 22 How. Pr. 198 ; *Palmer* v. *De Witt*, 47 N. Y. 532, 536.

Against these opinions are *Wetmore* v. *Scovell*, 3 Edw. Ch. 515, and *Hoyt* v. *Mackenzie*, 3 Barb. Ch. 320, decided respectively of Vice-Chancellor McCoun and Chancellor Walworth while sitting alone. They were criticised and overruled in *Woolsey* v. *Judd*, 4 Duer, 379, by a court of six judges. There are also certain doubtful dicta by a vice-chancellor in *Percival* v. *Phipps*, 2 V. & B. 19, 28, which are relied upon as asserting a somewhat similar view. But it is not necessary to discuss them in detail, for

this review of cases demonstrates that the weight of decisions by courts of great authority, speaking often through judges of high distinction for learning and ability, supports the conclusion that equity will afford injunctive relief to the author against the publication of his private letters upon commonplace subjects without regard to their literary merit or the popular attention or special curiosity aroused by them.

The same conclusion is reached on principle and apart from authority. It is generally recognized that one has a right to the fruits of his labor. This is equally true, whether the work be muscular or mental or both combined. Property in literary productions, before publication and while they rest in manuscript, is as plain as property in the game of the hunter or in the grain of the husbandman. The labor of composing letters for private and familiar correspondence may be trifling, or it may be severe, but it is none the less the result of an expenditure of thought and time. The market value of such an effort may be measured by the opinions of others, but the fact of property is not created thereby. A canvas upon which an obscure or unskilful painter has toiled does not cease to be property merely because by conventional standards it is valueless as a work of art. Few products of the intellect reveal individual characteristics more surely than familiar correspondence, entries in diaries or other unambitious writings. No sound distinction in this regard can be made between that which has literary merit and that which is without it. Such a distinction could not be drawn with any certainty. While extremes might be discovered, compositions near the dividing line would be subject to no fixed criterion at any given moment, and scarcely anything is more fluctuating than the literary taste of the general public. Even those counted as experts in literature differ widely in opinion both in the same and in successive generations as to the relative merits of different authors. The basic principle on which the right of the author is sustained even as to writings confessedly literature is not their literary quality, but the fact that they are the product of labor.

The existence of a right in the author over his letters, even though private and without worth as literature, is established on principle and authority. The right is property in its essential features. It is, therefore, entitled to all the protection which the

Constitution and laws give to property. From this general state-
ment are to be excepted special instances, such as letters by an
agent to or for his principal and others where the conditions in-
dicate that the property in the form or expression is in another
than the writer. The absolute right of the author to prevent
publication by the receiver may also be subject to limitations
arising from the nature of the letter or the circumstances under
which it is written or received. Some of these are pointed out in
*Folsom* v. *Marsh,* 2 Story, 100. But these exceptions are narrow
and rare, and do not affect materially the general rule.

The extent of this proprietary right, as between the writer
and the recipient of letters, requires a closer analysis. It de-
pends upon implications raised by law from the circumstances.
This test is a general one, and has been applied to the public
delivery of lectures, the presentation of dramas, and other anal-
ogous cases. *Abernethy* v. *Hutchinson,* 3 L. J. Ch. 209; *S. C.*
1 Hall & Tw. 28. *Tompkins* v. *Halleck,* 133 Mass. 32. *Nicols*
v. *Pitman,* 26 Ch. D. 374, 380. The relative rights of the writer
and receiver may vary with different conditions. If there be a
request for return or if the correspondence is marked in definite
terms, as personal or confidential, such special considerations
would need to be regarded. The case at bar presents the ordinary
example of friendly correspondence between kinswomen upon
topics of mutual private interest. Under such circumstances,
What does the writer retain and what does he give to the person
to whom the letter is sent? The property right of the author
has been described as " an incorporeal right to print [and it
should be added to prevent the printing of, if he desires] a set
of intellectual ideas or modes of thinking, communicated in a set
of words and sentences and modes of expression. It is equally
detached from the manuscript, or any other physical existence
whatsoever." *Millar* v. *Taylor,* 4 Burr. 2303, at 2396. It has
been called also " the order of words in the . . . composition."
*Jefferys* v. *Boosey,* 4 H. L. Cas. 815, 867. *Holmes* v. *Hurst,* 174
U. S. 82, 86. *Kalem Co.* v. *Harper Bros.* 222 U. S. 55, 63. The
right of the author to publish or suppress publication of his
correspondence is absolute in the absence of special considera-
tions, and is independent of any desire or intent at the time of
writing. It is an interest in the intangible and impalpable

thought and the particular verbal garments in which it has been clothed. Although independent of the manuscript, this right involves a right to copy or secure copies. Otherwise, the author's right of publication might be lost. The author parts with the physical and material elements which are conveyed by and in the envelope. These are given to the receiver. The paper upon which the letter is written belongs to the receiver. *Oliver* v. *Oliver*, 11 C. B. (N. S.) 139. *Grigsby* v. *Breckinridge*, 2 Bush, 480, 486. *Pope* v. *Curl*, 2 Atk. 341. *Werckmeister* v. *American Lithographic Co.* 142 Fed. Rep. 827, 830. A duty of preservation would impose an unreasonable burden in most instances. It is obvious that no such obligation rests upon the receiver, and he may destroy or keep at pleasure. Commonly there must be inferred a right of reading or showing to a more or less limited circle of friends and relatives. But in other instances the very nature of the correspondence may be such as to set the seal of secrecy upon its contents. See *Kenrick* v. *Danube Collieries & Minerals Co.* 39 W. R. 473. Letters of extreme affection and other fiduciary communications may come within this class. There may be also a confidential relation existing between the parties, out of which would arise an implied prohibition against any use of the letters, and a breach of such trust might be restrained in equity. On the other hand, the conventional autograph letters by famous persons signify on their face a license to transfer. Equitable rights may exist in the author against one who by fraud, theft or other illegality obtains possession of letters. The precise inquiry is whether indifferent letters written by one at the time perhaps little known or quite unknown, which subsequently acquire value as holographic manuscripts, may be marketed as such. This case does not involve personal feelings or what has been termed the right to privacy. 4 Harvard Law Review, 193. The author has deceased. Moreover, there appears to be nothing about these letters, knowledge of which by strangers would violate even delicate feelings. Although the particular form of the expression of the thought remains the property of the writer, the substance and material on which this thought has been expressed have passed to the recipient of the letter. The paper has received the impression of the pen, and the two in combination

have been given away.  The thing which has value as an autograph is not the intactable thought, but the material substance upon which a particular human hand has been placed, and has traced the intelligible symbols.  Perhaps the autographic value of letters may fluctuate in accordance with their length or the nature of their subject matter.  But whatever such value may be, in its essence it does not attach to the intellectual but material part of the letter.

This exact question has never been presented for adjudication, so far as we are aware.  There are some expressions in opinions, which dissociated from their connection may be laid hold of to support the plaintiff's contention.  See *Dock* v. *Dock*, 180 Penn. St. 14, 22 ; *Eyre* v. *Higbee*, 22 How. Pr. 198; *Palin* v. *Gathercole*, 1 Collyer, 565.  It may well be that title such as appears to exist in the recipient may not go to the extent of being assets in the hands of a decedent, a bankrupt or an insolvent.  *Eyre* v. *Higbee*, 22 How. Pr. 198.  *Sibley* v. *Nason*, 196 Mass. 125.  But on principle it seems to flow from the nature of the right transferred by the author to the receiver and of that retained by the writer in ordinary correspondence, that the extent of the latter's proprietary power is to make or to restrain a publication, but not to prevent a transfer.  The rule applicable to the facts of this case, as we conceive it to be, is that in the absence of some special limitation imposed either by the subject matter of the letter or the circumstances under which it is sent, the right in the receiver of an ordinary letter is one of unqualified title in the material on which it is written.  He can deal with it as absolute owner subject only to the proprietary right retained by the author for himself and his representatives to the publication or non-publication of idea in its particular verbal expression.  In this opinion publication has been used in the sense of making public through printing or multiplication of copies.

The result is that an injunction may issue against publication or multiplication in any way, in whole or in part, for advertising or other purposes, of any of the letters described in the bill, and allowing the plaintiff, if he desires, to make copies thereof within a reasonable time, but going no further.

*So ordered.*